UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBERT P. LYNCH,

Plaintiff,

-against-

Index No.: _________

**COMPLAINT**

ROMAN CATHOLIC DIOCESE OF BROOKLYN, ST. RAPHAEL CATHOLIC PARISH, GOOD SHEPHERD PARISH, and FATHER JAMES K. CUNNINGHAM,

Defendants.

**JURY TRIAL DEMANDED**

Plaintiff Robert P. Lynch, by his undersigned attorneys, for his Complaint against Defendants Roman Catholic Diocese of Brooklyn (the "Diocese"), St. Raphael Catholic Parish (the "St. Raphael Parish"), Good Shepherd Parish and Father James K. Cunningham ("Father Cunningham"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action by Mr. Lynch to hold Defendants responsible for the egregious sexual abuse that Mr. Lynch had to endure by a priest, the failure of the Diocese and the Parishes to stop or prevent such abuse, and the outrageous re-victimization Mr. Lynch suffered when the Diocese forced him to face two abusers, one when Lynch was a minor, Father James I. Frost, and one after Lynch was no longer a minor, Defendant Father Cunningham, without warning and without support. Due to Defendants' abominable behavior toward Mr. Lynch, Mr. Lynch suffered personally and professionally, and continues to suffer to this day.

2. Mr. Lynch was born and raised in an observant Catholic family. His family attended church every week and his parents sent their children to Catholic elementary and secondary schools.

3. In 1991, Mr. Lynch's father died unexpectedly. In addition to the devastation of this sudden loss, his death put the Lynch family in dire financial condition. When Mr. Lynch's mother could

no longer afford the tuition for Mr. Lynch's high school, she contacted the principal, Bishop Catanello, to withdraw Mr. Lynch from the school. As a supposed act of kindness, Bishop Catanello allowed Mr. Lynch to attend the school tuition-free.

4. As a result, Mr. Lynch came to feel deeply indebted to the school and Church and became even more involved in the Parish.

5. It was during this time that Mr. Lynch's first abuser, Father Frost, took advantage of his vulnerability while pretending to engage as a father figure in Mr. Lynch's life.

6. In 1992, when Mr. Lynch was about sixteen years old, Father Frost began to abuse him sexually. The abuse, spanning at least two years, caused tremendous pain and suffering in the young teenager.

7. A few years later, Defendants passed Mr. Lynch off to a new abusive priest within the Diocese, and Lynch fell victim to Father Cunningham.

8. This time, Mr. Lynch finally mustered the strength to report the incidents of abuse to the Diocese.

9. Rather than help the distressed victim, the Diocese ordered Mr. Lynch to attend a meeting and—without warning or support—forced him to face Father Frost and Father Cunningham in tandem, purportedly to recount as best he could under the circumstances the horrific incidents, but really to listen to the perpetrators' lies and denials.

10. Mr. Lynch was re-victimized by the meeting as well as victimized in a new manner, contributing to his ongoing pain and emotional distress.

11. Defendants did nothing to rectify Mr. Lynch's suffering and Father Cunningham continued as a priest, as did Father Frost. The Diocese did not contact Mr. Lynch again for over twenty years.

12. With this action, Mr. Lynch seeks to hold Defendants accountable for the humiliation, pain and suffering he has endured during and as a result of the sexual abuse and the resulting trauma that has

affected all aspects of his life. In particular, Defendants must be made to answer for their conduct and remedy Mr. Lynch's damages caused by battery, assault, false imprisonment and emotional abuse.

13. On February 14, 2019, New York enacted the Child Victims Act ("CVA"), which revived certain claims based on sexual abuse against minor—but not adult—victims.

14. On May 24, 2022, New York enacted the New York Adult Survivors Act ("ASA") to amend the statute of limitations and revive liability for certain claims based on sexual abuse of adult victims, which claims had been previously barred by the statute of limitations. The ASA permits individuals like Mr. Lynch—who was over 18 when Father Cunningham abused him—to bring formerly time-barred claims during the one-year "window" between November 24, 2022 and November 23, 2023. The ASA expressly provides that an earlier dismissal of claims as time-barred shall not be grounds for dismissal of a revival action pursuant to the ASA.[1]

15. Mr. Lynch suffered sexual abuse by individuals under the control and supervision of the Diocese and the Parishes both while he was a minor child and after he reached the age of majority. Specifically, Father Frost abused him while he was a minor and Father Cunningham abused him after he turned eighteen, and other representatives of the Diocese and Parishes mentally abused Mr. Lynch when both a minor and after he turned eighteen.

16. A separate action based on the abuse that took place while Mr. Lynch was a child is currently pending under the caption *Robert Lynch v. Roman Catholic Diocese of Brooklyn, St. Raphael Catholic Parish and Father James I. Frost* (Supreme Court of the State of New York, County of Kings, Index No. 517922/2019). Mr. Lynch originally brought claims based on the abuse he suffered at the hands of defendant Father Cunningham in that action, but those claims were dismissed as time-barred because Father Cunningham abused Mr. Lynch after Mr. Lynch reached the age of eighteen, and those claims accordingly were not revived by the Child Victims Act, which revived only those claims that are based on sexual abuse of minor children.

---

[1] *See* CPLR § 214-J.

17. Mr. Lynch's claims based on abuse that occurred after his eighteenth birthday have subsequently been revived by the Adult Survivors Act and are brought herein.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1332 because complete diversity exists and the matter in controversy exceeds $75,000, exclusive of interest, costs and fees.

19. This Court may exercise personal jurisdiction over Defendants because Defendants Diocese and the Parishes are located within this District and, upon information and belief, Father Cunningham resides within this District. Personal jurisdiction is also proper in that Father Cunningham committed the actions alleged herein, which occurred on premises owned and/or controlled by the Diocese and Parish, within this District and the State of New York.

20. Venue is proper in this Court in that the sexual abuse occurred in this District.

## THE PARTIES

21. Robert P. Lynch is an individual residing in Miami-Dade County, Florida.

22. The Diocese is a domestic Not-For-Profit Organization duly existing under the laws of the State of New York and has its Diocesan offices in the County of Kings, New York.

23. The Diocese is comprised of the boroughs of Brooklyn and Queens and operates the Catholic school system in both boroughs. At the relevant times at issue, until 2003, Thomas v. Daily was the Bishop of the Diocese.

24. St. Raphael Parish is a domestic Not-For-Profit Organization duly existing under the laws of the State of New York.

25. Good Shepherd Parish is a domestic Not-For-Profit Organization duly existing under the laws of the State of New York.

26. Father Cunningham is, upon information and belief, a resident of the State of New York.

## FACTS

Background

27. Mr. Lynch was born in New York on January 9, 1976 and was raised in an observant Catholic family.

28. The family attended church at the St. Raphael Parish every week and both Mr. Lynch's father and mother worked for the Parish at one time or another.

29. All the children of the Lynch family went to Catholic schools. From first to eighth grade, Mr. Lynch went to the St. Raphael School of St. Raphael Parish. In ninth grade, he entered the Cathedral Preparatory School and Seminary ("Cathedral Prep") with the belief that he ultimately would devote his adult life to the Parish.

30. In 1991, when Mr. Lynch was just 15 years old, Mr. Lynch's father suffered a heart attack while working at St. Raphael Parish and passed away. The sudden death of the father and breadwinner left Mr. Lynch and his family in a dire financial condition.

31. When the family could no longer afford the tuition for Mr. Lynch's attendance at Cathedral Prep, the school principal, Bishop Catanello, allowed Mr. Lynch to attend the school without being charged a tuition.

32. Feeling deeply indebted to the school and Church, Mr. Lynch worked hard to get good grades, became further involved in the Parish and continued to consider becoming a priest himself.

33. Bishop Catanello's supposed act of kindness soon turned into a curse as the Parish Fathers took advantage of Mr. Lynch's vulnerability.

Father Frost Abuses Mr. Lynch Between 75 and 100 Times

34. While attending Cathedral Prep, Mr. Lynch often served as an altar boy during mass at St. Raphael Parish and worked in the Parish's rectory for and with Father Frost and Father Cunningham.

35. In or about 1992, when Mr. Lynch was 16 years old, Father Frost began to sexually abuse Mr. Lynch.

36. Father Frost would catch Mr. Lynch when he was working alone at the St. Raphael Parish after school. Usually, Father Frost would forcibly remove Mr. Lynch's pants and underwear, fondle Mr. Lynch's penis and rub his erect penis on Mr. Lynch. Or, Father Frost would lie on top of Mr. Lynch and grind his erect penis on Mr. Lynch's buttocks.

37. These incidents occurred between 75 and 100 times spanning at least two years.

38. Mr. Lynch never consented to any of these sexual acts. Rather, he felt deeply humiliated, frightened and helpless.

39. The Diocese had no functional policy or oversight to prevent a priest from being alone with a minor or young adult and from engaging in sexual abuse.

40. This lack of policy or oversight is especially egregious in light of the now-exposed rampant abuse by members of the Clergy, including those at Defendants' places of worship, of young boys and the systemic abuse by Father Frost and Father Cunningham, whose activities were covered up and ignored by the Diocese and Parishes.

41. Rather than take appropriate measures to stop the sexual abuse by priests and to punish those responsible and assure that the abuse would not continue, the Church,[2] the Diocese, including the Diocese's then-acting prelate, Bishop Daily,[3] and the Parishes did their collective best to hide, conceal and cover up the potential scandal. To this end, as alleged in a 2003 lawsuit, Father Frost was moved from parish to parish to cover up, and hide from, claims of sexual abuse.

---

[2] As the United States Conference of Catholic Bishop stated in its 2002 "Charter for the Protection of Children and Young People": "The Church in the United States is experiencing a crisis without precedent in our times. The sexual abuse of children and young people by some priests and bishops, and the ways in which we bishops addressed these crimes and sins, have caused enormous pain, anger, and confusion. . . . In the past, secrecy has created an atmosphere that has inhibited the healing process and, in some cases, enabled sexually abusive behavior to be repeated." Despite this 2002 resolution, it took the Diocese another 15 years to contact Robert about the pain and injury he has suffered.

[3] Bishop Daily was named as a defendant in dozens of lawsuits filed by victims of clergy abuse in the Boston and Brooklyn Dioceses. Most infamously, while he was Chancellor and Vicar General in the Diocese of Boston, he knowingly allowed Father Geoghan—a serial child rapist—to continue as a priest in the same parish. Daily had known of Geoghan's behavior as early as 1980, but did nothing to stop or prevent further abuses, which continued until Geoghan's retirement in 1993.

42. Shortly after Mr. Lynch reported the abuse by Father Frost, in 1999, the Diocese again transferred Father Frost, this time from Saint Raphael Parish to Corpus Christi Parish.

Father Cunningham Abuses, Assaults and Attempts to Rape Mr. Lynch

43. Father Frost's abuse left Mr. Lynch vulnerable to sexual abuse by another priest, Father Cunningham.

44. This abuse occurred when Mr. Lynch had just reached the age of majority.

45. When Mr. Lynch was living in the college seminary, Father Cunningham, preying on this defenseless and confused victim, developed what Mr. Lynch believed was a normal mentoring relationship but which in fact was a relationship designed for Father Cunningham to prey upon Mr. Lynch.

46. In the fall of 1996, Father Cunningham arranged to be alone with Mr. Lynch in Cunningham's room at the Good Shepherd Parish in Brooklyn and ambushed him with an attempted rape effort.

47. After pretending to be "wrestling," Father Cunningham suddenly pinned Mr. Lynch down on the bed, started kissing his neck, forcibly pulled down his pants and began to fondle Mr. Lynch's penis, trying to get him aroused.

43. Mr. Lynch struggled to get free and, eventually, was able to kick Father Cunningham in the groin to get out from underneath him and flee the scene.

44. Mr. Lynch summoned the internal fortitude to report Father Cunningham to Church authorities.

45. The Diocese had no functional policy or oversight to prevent a priest, including Father Cunningham (or Father Frost), from being alone with a minor or young adult and from engaging in sexual abuse.

The Diocese and Priests Re-Victimize Mr. Lynch

46. Mr. Lynch contacted Auxiliary Bishop Catanello, his mentor and former Principal at Cathedral Prep, and gathered the courage to provide information about both Father Frost and Father Cunningham.

47. Rather than giving him support and comfort, the Church authorities, as punishment for reporting Frost and Father Cunningham, abused Mr. Lynch not physically but psychologically.

48. In February 1997, shortly after contacting Auxiliary Bishop Catanello, Mr. Lynch was summoned to the Diocese. Without warning or being provided with any support, and barely 21-years old, Mr. Lynch was led into a room where first he faced Father Frost and Father Cunningham.

49. In the presence of his abusers, Mr. Lynch was forced to recount in detail the sexual abuse he had suffered and to listen to his abusers' false denials, all while being safeguarded and protected by senior representatives of the Diocese and Parishes.

50. The additional trauma of being subjected to this process was immense – the meeting was designed and orchestrated to intimidate Mr. Lynch and prevent him from pursuing or officially reporting his claims.

51. The Diocese and the Parishes refused to support Mr. Lynch in overcoming his trauma and they refused to take any remedial actions against the priests. Father Frost continued to be a priest until 2002. Father Cunningham remains a priest in good standing in the Diocese.

52. Upon information and belief, the Diocese and the Parishes never contacted law enforcement about the abuse or took any other remedial or protective measures, other than the measures the Diocese and Parish took to cover up and protect Father Frost and Father Cunningham.

53. Shortly after this meeting, St. Raphael Parish and/or Father Frost fired without cause Mr. Lynch's mother, who was working there at the time, as retribution and as a warning to Mr. Lynch.

54. Mr. Lynch was re-victimized and traumatized by being forced to face his abusers, without notice or support, by realizing that his abusers were not seeing any consequences whatsoever and by realizing that his decision to report his abusers resulted in hardship for his mother and family.

Mr. Lynch's Pain and Suffering is Tremendous and Ongoing

55. The abuse by Father Frost and Father Cunningham and the outrageous meeting the Diocese orchestrated left Mr. Lynch shaken. The pain, emotional distress and anger has had and continues to have a deep effect on all aspects of Mr. Lynch's life.

56. First, Mr. Lynch lost his faith. He stopped going to church and dropped his plans of becoming a priest. At the time of the re-victimization by the Diocese, Mr. Lynch was a philosophy major at St. John's University and planned to study theology. He gave up this plan and changed his major to criminal justice. He eventually became a police officer—a profession likely chosen in an unconscious attempt to compensate for his feelings of inferiority and insecurity.

57. Further, Mr. Lynch's confidence has been significantly diminished, in particular with regard to women. He eventually married, but he does and always did struggle with intimacy.

58. Also, for the majority of his marriage, Mr. Lynch was not able to talk about the sexual abuse he endured as a minor and young adult. Indeed, Mr. Lynch was not able to tell his wife about the abuse until 2017. This and the problems with intimacy have put an enormous strain on his marriage.

59. Further, Mr. Lynch experienced a severe blow to his career as a result of his insecurities and fear of intimacy. In an effort to avoid intimacy, he began to engage in fantasies. As a police officer, this led him to inquire into arrests in other departments in which he was not involved, including the arrest of a prostitute. The Internal Affairs Bureau deemed this focus on others' investigations to be a concern and, after an internal police investigation, took away Mr. Lynch's gun and shield and forced him into early retirement.

60. According to his therapist, Mr. Lynch's compulsion toward fantasy and avoidance of real intimate contact is clearly linked to the sexual abuse that began with Father Frost and was continued by Father Cunningham.

61. In May 2018, Mr. Lynch saw Father Cunningham again for the first time since the Diocese's confrontational meeting and the feelings of shock, disgust, anger and frustration overwhelmed him. The fact that Father Cunningham is able to walk away from the sexual abuse without consequence, while Mr. Lynch has to suffer both privately and professionally, is unbearable.

62. Shortly thereafter, Mr. Lynch began attending group counseling sessions for sexual abuse victims in an effort to cope with the trauma he still feels.

63. The effects of the abuse on every aspect of Mr. Lynch's life cannot be fully quantified or remedied. Mr. Lynch suffers from anxiety, depression and betrayal as a result of the sexual abuse and the Diocese's and Parishes' failure to prevent the abuse or to discipline the abusers.

<u>The Diocese and the Parishes Do Nothing For 20 Years</u>

64. After the fateful meeting in February 1997, the Diocese and the Parishes never contacted Mr. Lynch again. They did not properly investigate the allegations but, as is their known pattern, see *supra*, the Diocese and the Parishes did their best to hide, conceal and cover up the potential scandal.

65. The failure by both the Diocese and the Parishes to investigate or report the sexual abuse allowed Father Frost and Father Cunningham to continue working and engaging with minors and young adults.

66. Father Cunningham remains a priest in good standing of the Diocese.

67. For more than 20 years, the Diocese and the Parishes ignored Mr. Lynch's pain and suffering.

68. Only on July 27, 2018, the Diocese offered Mr. Lynch an insignificant settlement payment, pursuant to the Independent Reconciliation and Compensation Program for Mr. Lynch to give up his claims against the Diocese.

69. In creating the Independent Reconciliation and Compensation Program, the Diocese acknowledged its responsibility for the tragic scandal of clergy sexual abuse. The program has been publicly announced, for example on the Diocese's website. *See* https://dioceseofbrooklyn.org/uncategorized/diocese-brooklyn-announces-independentreconciliation-compensation-program-survivors-clergy-sexual-abuse/ (last visited on 1/31/2020).

70. The amount offered to Mr. Lynch under the Independent Reconciliation and Compensation Program was completely inadequate to make up for the injuries and damage Mr. Lynch suffered as a minor and young adult and was not remotely commensurate with the pain, suffering and permanent injury sustained by Mr. Lynch.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(against Father Cunningham)**
**BATTERY**

71. Plaintiff repeats and re-alleges each of the above averments.

72. By his conduct, Father Cunningham intended to make bodily contact with Plaintiff.

73. Father Cunningham made bodily contact with Plaintiff, as further described and outlined above.

74. Father Cunningham's intentional bodily contact was harmful and offensive in nature.

75. The conduct of Father Cunningham also constituted a sexual offense as defined in Article 130 of the New York Penal Law.

76. Father Cunningham's conduct caused and continues to cause injury, loss and damages to Plaintiff in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**(against Father Cunningham)**
**ASSAULT**

77. Plaintiff repeats and re-alleges each of the above averments.

78. By his conduct, Father Cunningham unreasonably threatened to make immediate harmful and offensive contact with Plaintiff.

79. The conduct of Father Cunningham was intentional.

80. By his conduct, Father Cunningham created in Plaintiff a reasonable apprehension of immediate physical harm and offensive contact.

81. By his conduct, Father Cunningham presented the apparent present ability to effectuate the threats against Plaintiff.

82. The conduct of Father Cunningham also constituted a sexual offense as defined in Article 130 of the New York Penal Law.

83. By reason of the above, Plaintiff has been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(against Father Cunningham)**
**FALSE IMPRISONMENT**

84. Plaintiff repeats and re-alleges each of the above averments.

85. By his conduct, Father Cunningham intended to confine or restrain Mr. Lynch to a bounded area.

86. During the abuse, Father Cunningham did confine or restrain Plaintiff to a bounded area, in particular by using physical force as described above.

87. The conduct of Father Cunningham also constituted a sexual offense as defined in Article 130 of the New York Penal Law.

88. Father Cunningham's conduct caused and continues to cause injury, loss and damages to Plaintiff in an amount to be determined at trial.

89. Father Cunningham's conduct caused and continues to cause injury, loss and damages to Plaintiff in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(against the Diocese and the Parishes)**
**NEGLIGENT HIRING, RETENTION AND SUPERVISION**

90. Plaintiff repeats and re-alleges each of the above averments.

91. The sexual abuse of minors by adults, including priests, including by Father Cunningham, was foreseeable.

92. The Diocese and the Parish at all relevant times held the Parish and its churches to be a safe place for engaging in spiritual activities, learning and youth activities. With that, the Diocese and the Parish entered into an express and/or implied duty to provide a reasonably safe environment for Plaintiff and assumed the duty to protect and care for him.

93. The Diocese and the Parishes negligently hired, retained, directed and supervised Father Cunningham as they knew or should have known that Father Cunningham posed a threat of sexual abuse to children, teenagers and young adults.

94. The Diocese and the Parishes knew or should have known of Father Cunningham's propensity for the conduct which caused Plaintiff's injuries prior to, or about the time of, the injuries' occurrence.

95. The Diocese and the Parishes owed a duty of care to all minor persons, including Plaintiff, who were likely to come within influence or supervision of Father Cunningham in his role as mentor, priest, counselor, trustee, director, officer, employee, agent, servant and/or volunteer, to insure that Father Cunningham did not use his assigned positions to injure minors by sexual battery, assault, abuse or sexual contact with children, teenagers and young adults.

96. Father Cunningham committed battery, assaulted, sexually abused and had sexual contact with Plaintiff on Defendants' premises, including the rectories of St. Raphael Parish and Good Shepherd Parish.

97. The Diocese and the Parishes were negligent in failing properly to supervise Father Cunningham.

98. The Diocese and the Parishes were negligent in failing to properly supervise the rectories, in particular St. Raphael Parish and Good Shepherd Parish, in order to prevent pedophiles from using these locations as an opportunity to meet and abuse minors.

99. At all times material hereto, the Diocese's and Parishes' actions or failures to act were willful, wanton, malicious, reckless and/or outrageous in their disregard for the rights and safety of Plaintiff.

100. As a direct and proximate result, Plaintiff has suffered injury, including but not limited to severe emotional distress and economic losses which continue to this day.

101. Plaintiff claims damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(against the Diocese and the Parishes)**
**GROSS NEGLIGENCE**

102. Plaintiff repeats and re-alleges each of the above averments.

103. The Diocese and the Parishes, at all relevant times, had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiff.

104. In particular, the Diocese had a duty to exercise reasonable care to avoid and/or protect young parishioners like Plaintiff from sexual abuse and/or to investigate and pursue complaints of criminal conduct, sexual misconduct and violations of the law against their young parishioners like Plaintiff.

105. The Diocese and the Parishes owed Plaintiff such a duty of reasonable care at all relevant times, prior to, during and subsequent to Father Cunningham's misconduct.

106. At the time of the abuse, it was foreseeable for the Diocese and the Parishes under the circumstances that the abuse as described above would happen, was happening and/or minors were at risk that it would be or was happening.

107. The Diocese and the Parishes knew, or were grossly negligent in not knowing, that Father Cunningham posed a threat of sexual abuse to children, teenagers and young adults, including to Plaintiff.

108. The acts of Father Cunningham, described above, were undertaken and/or enabled by, and/or occurred during the course of, and/or occurred within the scope of, Father Cunningham's employment, appointment, assignment and/or agency with the Diocese and the Parishes.

109. The acts of Father Cunningham, alleged above, occurred on the premises of the Diocese and the Parishes.

110. The Diocese's and the Parishes' willful, wanton, grossly negligent acts and failures to act resulted directly and proximately in the injury and damages of Mr. Lynch as set forth above.

111. The Diocese and the Parishes breached their duties in the following non-exhaustive ways:

- employed and/or retained improper persons in work which created the opportunity for placing others, in particular children, teenagers and young adults, at risk of harm, without adequately assessing their suitability to be in unsupervised, direct contact with minors and vulnerable persons;
- failed to introduce adequate policies, rules and training to prevent, remedy, investigate and/or report sexual abuse;
- failed adequately to supervise the activities of Father Cunningham;
- allowed and/or intentionally failed and/or neglected to prevent tortious conduct upon persons on the Diocese's and Parishes' premises and, in particular, allowed and/or enabled the acts as set forth in this Complaint to occur; and
- failed to take appropriate remedial actions upon learning of tortious conduct by persons under their control and on their premises, in particular upon learning of the sexual abuse of Mr. Lynch by two of their priests.

112. At all times material hereto, the Diocese's and Parishes' actions or failures to act were willful, wanton, malicious, reckless and/or outrageous in their disregard for the rights and safety of Plaintiff. The Diocese and Parishes failed to exercise even slight care or slight diligence to safeguard and protect Plaintiff, similar to the willful, wanton, malicious, reckless and/or outrageous disregard for the rights and safety of other victims of sexual abuse by multiple priests, including but not limited to Father Cunningham.

113. As a direct and proximate result of the Diocese's and Parishes' grossly negligent conduct, Plaintiff has suffered injuries, including but not limited to severe emotional distress and economic losses, which continue to this day.

114. Defendants' above-alleged wrongful conduct constitutes gross negligence.

115. Plaintiff claims damages, including punitive damages, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## (against all Defendants)
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116. Plaintiff repeats and re-alleges each of the above averments.

117. Defendants engaged in extreme and outrageous conduct with the intention of causing or with reckless disregard of the probability of causing Plaintiff severe and extreme emotional distress.

118. Father Cunningham acted in the course of his employment and/or assignment with the Diocese and/or Parish, while exhibiting intentional disregard for the emotional wellbeing of Plaintiff.

119. Father Cunningham, in conspiracy with the Diocese, the Parishes and Father Frost, treated Plaintiff with extreme and outrageous behavior through efforts to conceal their sexual abuse and subjecting Plaintiff to a traumatizing confrontation with his abusers.

120. Defendants' conduct toward Plaintiff was extreme and outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

121. Due to the outrageous conduct of the Defendants, Plaintiff suffered and continues to suffer significant and enduring mental anguish and trauma as well as physical pain and suffering.

122. The damage caused has plagued and will continue to plague Plaintiff for the remainder of his life.

123. As a direct result of the intentional actions of Defendants, Plaintiff has suffered severe emotional distress which continues to this day.

124. Plaintiff claims damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**(against all Defendants)**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

125. Plaintiff repeats and re-alleges each of the above averments.

126. As described above, the actions of the Defendants were conducted in a negligent manner.

127. Defendants' actions endangered Plaintiff's safety and caused him to fear for his own safety and wellbeing.

128. As a direct result of the actions of Defendants, which included but were not limited to, negligent conduct, Plaintiff has suffered severe emotional distress which continues to this day.

129. Plaintiff claims damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**(against all Defendants)**
**BREACH OF FIDUCIARY DUTY**

130. Plaintiff repeats and re-alleges each of the above averments.

131. Plaintiff was raised Catholic, observing Catholic tradition, attending church every Sunday and going to Catholic Schools. He was raised to put faith in the Catholic church, the Diocese, the Parishes and the priests and he did in fact put his trust in Defendants for his moral and spiritual welfare.

132. After his father's sudden death, Plaintiff looked up to the priests of the Diocese and the Parishes as father figures and role models, including and in particular to Father Cunningham.

133. Due to the inability of Plaintiff's family to pay for his tuition at Cathedral Prep, Plaintiff felt indebted to the Church for letting him attend school without tuition.

134. Considering the close ties between Plaintiff and the Diocese and the Parishes, Plaintiff considered priesthood and became even more involved with the Church, the Diocese and the Parishes, attending masses, working as an altar boy and working in the rectory of the Parishes.

135. As a result, Defendants created a unique degree of trust and confidence with Plaintiff and Plaintiff was taught to respect and defer to, and did respect and defer to, the authority of the clergy and priests, in particular to Father Frost and Father Cunningham and their supervisors.

136. The relationship of trust, confidence and reliance between the Plaintiff and Defendants also is based on the entrustment of Plaintiff while he was a minor to the care and supervision of the Defendants.

137. The resulting relationship between the Defendants and Plaintiff was one of de facto control and dominance.

138. As a result, the Defendants had a fiduciary relationship of trust, confidence and reliance with Plaintiff.

139. This entrustment of Plaintiff to the care and supervision of the Defendants required the

Defendants to assume fiduciary responsibility and to act in the best interest of Plaintiff to protect him.

140. Defendants breached their fiduciary duties to Plaintiff by abusing and mishandling Plaintiff for their own pleasure and to disregard the abuse and mishandling of Plaintiff with complete disregard of the effect their actions had and would forever have on Plaintiff.

141. Defendants' actions and omissions were intentional, reckless and outrageous in their disregard of the rights and safety of Plaintiff.

142. As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiff has suffered injury, loss and damages, which continue to this day, in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a jury trial in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robert P. Lynch respectfully prays that this Court will:

a) Enter judgment against each Defendant, jointly and severally, in such amounts as will fully and adequately compensate Plaintiff for the damages suffered, in an amount to be determined at trial;

b) Award Plaintiff punitive damages against Defendants in an amount to be determined at trial;

c) Award Plaintiff treble damages based on 18 U.S.C. § 1964, in an amount to be determined at trial;

d) Award Plaintiff pre- and post-judgment interest;

e) Award Plaintiff his actual expenses of litigation, including reasonable attorneys' fees;

f) Award Plaintiff injunctive relief that requires the Roman Catholic Diocese of Brooklyn to put in place (and fund) supervision and compliance protocols that actually prevent, uncover and stop the sexual abuse of parishioners; and

g) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York

Dated: New York, New York
June 27, 2023

**MOSKOWITZ, COLSON, GINSBERG & SCHULMAN LLP**

By: _/s/_________________

Peter R. Ginsberg
Eylan Schulman
Christopher Neff
80 Broad Street, 19th Floor
New York, New York 10004
(212) 257-6455
pginsberg@mcgsllp.com
eschulman@mcgsllp.com
cneff@mcgsllp.copm
*Attorneys for Plaintiff*