UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————X

ROBERT P. LYNCH,

                Plaintiff,                   **MEMORANDUM & ORDER**

    -against-                        23-cv-4800 (NRM) (LKE)

ROMAN CATHOLIC DIOCESE OF
BROOKLYN, ST. RAPHAEL CATHOLIC
PARISH, GOOD SHEPHERD PARISH, *and*
FATHER JAMES K. CUNNINGHAM,

                Defendants.
———————————————————X

ROBERT P. LYNCH,

                Plaintiff,

    -against-                        23-cv-8687 (NRM) (LKE)

ROMAN CATHOLIC DIOCESE OF
BROOKLYN, ST. RAPHAEL CATHOLIC
PARISH, *and* FATHER JAMES I. FROST,

                Defendants.
———————————————————X

**NINA R. MORRISON**, United States District Judge:

Plaintiff Robert P. Lynch invokes this Court's diversity jurisdiction and brings these two actions under New York tort law against the Catholic Diocese of Brooklyn (the "Diocese"), St. Raphael Catholic Parish ("St. Raphael"), Good Shepherd Catholic Parish ("Good Shepherd") (collectively the "Parish Defendants"), Father James K. Cunningham, and Father James I. Frost.  These cases, which have been designated related before the Court, involve allegations that Frost and Cunningham sexually abused Lynch decades ago.  Lynch also alleges that when he brought these allegations

1

to a Church official whom he trusted, that official further traumatized Lynch by arranging a pair of meetings where Lynch, alone and unsupported, was confronted by Frost and Cunningham and was then forced to recount the details of his abuse in their presence, before listening to Frost and Cunningham's denials.

Plaintiff seeks to toll the statute of limitations on these claims under the New York Adult Survivors Act (the "ASA"), N.Y. C.P.L.R. § 214-j, which established a one-year window for adult survivors of sexual abuse to raise civil claims under New York law that would otherwise be barred by the statute of limitations. The Diocese and the Parish Defendants have moved to dismiss the complaints. For the reasons outlined below, these motions are GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

The two complaints contain many overlapping factual allegations. The below facts are drawn from the two operative complaints, Second Amended Compl., No. 23-CV-8687 ("Frost Compl."), ECF No. 76; Second Amended Compl., No. 23-CV-4800 ("Cunningham Compl."), ECF No. 95, and are assumed to be true for purposes of this motion to dismiss. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021).

Lynch was born in New York and raised in an observant Catholic family. Frost Compl. ¶ 38; Cunningham Compl. ¶ 45. Lynch's family attended church at St. Raphael every week, and both Lynch's father and mother worked at St. Raphael at one time or another. Frost Compl. ¶ 39; Cunningham Compl. ¶ 46. From first grade to eighth grade, Lynch attended the St. Raphael Parish School. Frost Comp. ¶ 40; Cunningham Compl. ¶ 47. In ninth grade, Lynch entered the Cathedral Preparatory

School and Seminary ("Cathedral Prep") with the belief that he would devote his adult life to the Church.  Frost Comp. ¶ 40; Cunningham Compl. ¶ 47.

When Lynch was fifteen years old, his father suffered a heart attack while working at St. Raphael Parish and suddenly passed away.  Frost Comp. ¶ 41; Cunningham Compl. ¶ 48.  The death of Lynch's father left the family in dire financial straits.  Frost Comp. ¶ 41; Cunningham Compl. ¶ 48.  When Lynch could no longer afford tuition, the principal of Cathedral Prep, Bishop Catanello, allowed Lynch to continue attending the school without paying tuition.  Frost Comp. ¶ 42; Cunningham Compl. ¶ 49.  As a result, Lynch felt indebted to the school and the Church.  He became even more involved at St. Raphael and continued to consider becoming a priest himself.  Frost Comp. ¶ 43; Cunningham Compl. ¶ 50.

## I.    Abuse by Frost

While he was a student at Cathedral Prep, Lynch often served as an altar boy during mass at St. Raphael and worked in the rectory for and with Frost.  Frost Comp. ¶ 45.  Lynch worked at St. Raphael after school and on weekends.  *Id.* ¶ 46.

In or about 1992, when Lynch was sixteen years old, Frost began to sexually abuse Lynch.  *Id.* ¶ 47.[1]  While Lynch was working alone at St. Raphael after school, Frost repeatedly found him and proceeded to forcibly remove Lynch's pants and underwear, fondle Lynch's penis, and rub his erect penis against Lynch.  *Id.* ¶ 48.

---

[1] Though the complaint contains allegations that Frost abused Lynch when he was a child, Lynch does not in this case advance claims relating to this abuse.  Lynch has brought a separate action in New York State court under the New York Child Victims Act, in which he raises claims relating to the abuse he experienced when he was a child.  Frost Compl. ¶ 27.

Other times, Frost laid on top of Lynch and ground his erect penis on Lynch's buttocks. *Id.* These incidents occurred between 75 and 100 times over the course of three years, from at least June 1994 until well into 1996. *Id.* ¶¶ 47–48. Lynch's 18th birthday occurred in January 1996. *Id.* ¶ 48. Lynch never consented to any of these sexual acts and felt deeply humiliated, frightened, and helpless. *Id.* ¶ 49.

In and around 1984 (*i.e.*, several years before Frost began abusing Lynch), a series of priests were removed from duty at St. Mark's Church in Sheepshead Bay, New York. *Id.* ¶ 52. Frost was one of these priests. *Id.* ¶ 51. When Frost was removed from his position at St. Mark's, a Church representative made a written notation that Frost's removal was warranted because Frost was making "matters of prudence and delicacy" that arose out of the abuse committed by his predecessors "worse." *Id.* ¶ 53. The Church officials who received this message responded by transferring Frost to St. Raphael. *Id.*

The Diocese and St. Raphael also possessed and maintained personnel-file records indicating that Frost had been the subject of reports documenting concerns relating to inappropriate and sexualized conduct towards minors and vulnerable parishioners in the years before he abused Lynch. *Id.* ¶ 54. The Diocese and St. Raphael received and reviewed a professional assessment of Frost that documented "compulsive sexual behavior" that began when Frost was thirteen years old, Frost's pattern of engaging in sexual innuendo with teenagers, and his past involvement in sexualized and emotionally inappropriate relationships with minors and vulnerable parishioners. *Id.* ¶ 55. The personnel file also includes records documenting that

Frost was placed in formal therapy in 1986 after a "many-year emotional relationship with an adolescent." *Id.* ¶ 56. Professional evaluators identified this relationship as sexually inappropriate and indicative of profound boundary failures. *Id.* This treatment was arranged through clinicians approved by the Diocese and St. Raphael and was known to Frost's supervisors. *Id.* Documents in the personnel file also show that Frost wrote to other priests in the Diocese during his treatment to express appreciation for their continued support. *Id.* ¶ 57.

In 1997, the Diocese and St. Raphael received a formal psychological evaluation of Frost which concluded that he remained "vulnerable to return to his past behavior," including sexual misconduct, "especially when he is under stress." *Id.* ¶ 58. This report also concluded that Frost should have "no unsupervised contact with minors." *Id.*

The report further stated that Frost's psychological testing showed high emotional dependency, difficulty managing interpersonal boundaries, tendencies to intellectualize and suppress emotion, and a pattern of engaging in sexualized behavior in "emotionally arousing situations," including recent public sexual misconduct. *Id.* ¶ 59.

The Diocese and St. Raphael continued to assign Frost to pastoral duties that gave him unsupervised access to minors and vulnerable parish workers such as Lynch, despite receiving explicit warnings about, and having prior knowledge of, Frost's history of sexual misconduct. *Id.* ¶ 60. Lynch alleges that the decision to transfer Frost from St. Mark's rather than discipline him was a part of a longstanding

Diocese strategy of managing abusive clergy by quietly relocating them without warning parishioners. *Id.* ¶ 62. Specifically, Lynch alleges that the Diocese pursued this strategy in order to avoid disclosing the Diocese's and St. Raphael's knowledge of sexual abuse by priests. *Id.* He further alleges that the Diocese and St. Raphael failed to implement the basic safeguards recommended by the clinicians who evaluated Frost, including the recommendation that Frost be prohibited from unsupervised contact with minors. *Id.* ¶ 65. The Diocese and St. Raphael also failed to maintain any policy or oversight to prevent a priest from being alone with a minor or young adult or from engaging in sexual abuse. *Id.* ¶ 67.

Frost also abused other vulnerable parishioners besides Lynch. *Id.* ¶ 66. These additional victims reported Frost's sexual misconduct to the Diocese *before* Frost ever met Lynch. *Id.* ¶ 68. Yet the Diocese and St. Raphael never notified law enforcement of the allegations against Frost. *Id.* ¶ 69. Instead, Lynch asserts, the Diocese attempted to hide, conceal, and cover up the abuse to avoid a scandal. *Id.* ¶ 72. Shortly after Lynch reported Frost's abuse, in 1999, the Diocese again transferred Frost to a different Parish — this time, from St. Raphael to "Corpus Christi Parish." *Id.* ¶ 75.

## II.    Abuse by Cunningham

After Lynch turned eighteen, he began living in the college seminary. During this period, Father Cunningham developed what Lynch believed, at that time, was a "normal" mentoring relationship with Lynch. Cunningham Compl. ¶ 73. In the fall of 1996, Cunningham arranged to be alone with Lynch in Cunningham's room at the

Good Shepherd Parish in Brooklyn. *Id.* ¶ 74. During this encounter, Cunningham attempted to rape Lynch. *Id.* After pretending to be wrestling, Cunningham pinned Lynch to the bed, began kissing his neck, forcibly pulled down Lynch's pants, and began to fondle Lynch's penis. *Id.* ¶ 75. Lynch struggled to free himself, eventually kicking Cunningham and managing to flee. *Id.* ¶ 76.

## III. Lynch Reports the Abuse and Is Forced to Confront Frost and Cunningham

Following the abuse by Cunningham, Lynch reported the abuse by Frost and Cunningham to Auxiliary Bishop Catanello, Lynch's mentor and former principal at Cathedral Prep. Cunningham Compl. ¶ 78; Frost Compl. ¶ 81.

In February 1997, shortly after contacting Auxiliary Bishop Catanello, Lynch was summoned to the Diocese in Brooklyn. Cunningham Compl. ¶ 80; Frost Compl. ¶ 83. There, without warning, Lynch was led into a room where he was forced to discuss his allegations in the presence of each of his alleged abusers: first Frost, and then Cunningham. Cunningham Compl. ¶ 80; Frost Compl. ¶ 83. Lynch was directed to recount in detail the sexual abuse he had experienced at the hands of each priest, at which point he was then forced to listen to Frost's and Cunningham's false denials. Cunningham Compl. ¶ 81; Frost Compl. ¶ 84. Lynch alleges that these meetings were specifically orchestrated to intimidate him and deter him from pursuing or reporting his allegations to anyone outside the Church, and that the meetings left Lynch traumatized. Cunningham Compl. ¶ 82; Frost Compl. ¶ 85.

The Diocese and the Parish Defendants did not support Lynch in addressing the trauma caused by Lynch and Cunningham's sexual misconduct. Cunningham

Compl. ¶ 83; Frost Compl. ¶ 86.  Defendants refused to take any remedial action against Frost and Cunningham.  Cunningham Compl. ¶ 83; Frost Compl. ¶ 86.  The Diocese and the Parish Defendants never contacted law enforcement to report the allegations. Cunningham Compl. ¶ 84; Frost Compl. ¶ 87.   Nor did they take any other protective measures to ensure the safety of Lynch or any other young people in the Church.  Cunningham Compl. ¶ 84; Frost Compl. ¶ 87.

Lynch also alleges that, shortly after he reported Frost and Cunningham, St. Raphael and/or Frost fired his mother without cause from her job with the Parish, which Defendants intended to serve both as retribution and a warning.  Cunningham Compl. ¶ 85; Frost Compl. ¶ 88.

Frost remained a priest until 2002, and Cunningham remains a priest to the present day.  Cunningham Compl. ¶ 83; Frost Compl. ¶ 86.  The Diocese and the Parish Defendants never contacted Lynch again after the February 1997 meetings with his alleged abusers.  Cunningham Compl. ¶ 96; Frost Compl. ¶ 97.

Lynch was deeply affected by the abuse and the subsequent confrontation with his abusers at the Diocese.  Cunningham Compl. ¶ 87; Frost Compl. ¶ 90.  Lynch lost his faith, stopped attending church, and gave up his aspiration of becoming a priest. Cunningham Compl. ¶ 88; Frost Compl. ¶ 91.  Lynch continues to struggle with self-confidence and intimacy in his relationships and was unable for decades to discuss with his wife the abuse he had experienced as a child and young man.  Cunningham Compl. ¶¶ 89–90; Frost Compl. ¶¶ 92–93. After Lynch saw Cunningham in May 2018 for the first time since the meetings at the Diocese, he began attending group

counseling sessions for sexual abuse victims to better cope with the continued impact of his earlier trauma. Cunningham Compl. ¶¶ 93–94. Lynch also suffers from anxiety, depression, and feelings of betrayal. Cunningham Compl. ¶ 95; Frost Compl. ¶ 96.

## PROCEDURAL BACKGROUND

Lynch initiated the instant suits during the expanded one-year statute of limitations provided by the ASA. In one case (the "Cunningham case"), he named the Diocese, St. Raphael, Good Shepherd, and Cunningham, Compl. No. 23-CV-4800, ECF No. 1 (June 27, 2023), and in the other case (the "Frost case"), he named the Diocese, St. Raphael, and Frost, Compl., No. 23-CV-8687, ECF No. 1 (Nov. 22, 2023). The Cunningham case was assigned from its inception to this Court, Dkt. Entry dated June 27, 2023, No. 23-CV-4800, and the Frost case was reassigned to this Court as related, Ltr., No. 23-CV-8687, ECF No. 14; Dkt. Order dated Jan. 3, 2024. The Cunningham case was stayed from September 5, 2023, until March 29, 2024, during the pendency of a petition in U.S. District Court for the Southern District of New York that sought to fix venue for cases brought under the Child Victims Act in the Southern District and consolidate those cases. *See* Dkt. Order dated Sep. 5, 2023, No. 23-CV-4800; Ltr. Mot., No. 23-CV-4800, ECF No. 32 (Nov. 8, 2023); Dkt. Order dated Mar. 29, 2024, No. 23-CV-4800.

Cunningham and Frost individually answered the respective original complaints, Answer, No. 23-CV-4800, ECF No. 36 (Cunningham answer); Answer, No. 23-CV-8687, ECF No. 22 (Frost answer), and Lynch subsequently amended both

complaints, First Amended Compl., No. 23-CV-4800, ECF No. 41; First Amended Compl., No. 23-CV-8687, ECF No. 29. Cunningham and Frost again answered the respective first amended complaints, Amended Answer, No. 23-CV-4800, ECF No. 45; Amended Answer, No. 23-CV-8687, ECF No. 32, while the Diocese and the Parish Defendants filed letters requesting pre-motion conferences on their anticipated motions to dismiss, Ltr., No. 23-CV-4800, ECF No. 47; Ltr., No. 23-CV-4800, ECF No. 48; Ltr., No. 23-CV-4800, ECF No. 49; Ltr., No. 23-CV-8687, ECF No. 34; Ltr., No. 23-CV-8687, ECF No. 35. Lynch responded to these pre-motion conference letters. Ltr., No. 23-CV-4800, ECF No. 52; Ltr., No. 23-CV-8687, ECF No. 38. After reviewing these submissions, the Court denied Defendants' requests for pre-motion conferences as unnecessary and directed the parties to brief the motions to dismiss. Dkt. Order dated Dec. 4, 2024, No. 23-CV-4800; Dkt. Order dated Dec. 4, 2024, No. 23-CV-8687.

The fully bundled motions to dismiss were filed on June 24, 2025. Mot. to Dismiss, No. 23-CV-4800, ECF No. 69; Mem. in Supp., No. 23-CV-4800 ("Diocese Cunningham Mem."), ECF No. 70; Mem. in Opp'n, No. 23-CV-4800 ("Pl. Cunningham Mem."), ECF No. 73;[2] Reply in Supp., No. 23-CV-4800, ECF No. 82; Mot. to Dismiss, No. 23-CV-4800, ECF No. 74; Mem. in Supp., No. 23-CV-4800 ("Parish Cunningham

---

[2] The memoranda of law filed by Defendants on behalf of Lynch in opposition to each of the three motions to dismiss in the Cunningham case appear to be identical. *Compare* No. 23-CV-4800, ECF No. 73, *with* No. 23-CV-4800, ECF No. 76, *and* No. 23-CV-4800, ECF No. 80. Accordingly, in the interest of concision, references to the "Pl. Cunningham Mem." will cite to ECF No. 73 but refer to ECF No, 73, ECF No. 76, and ECF No. 80.

Mem."), ECF No. 75;[3] Mem. in Opp'n, No. 23-CV-4800, ECF No. 76; Reply in Supp., No. 23-CV-4800, ECF No. 77;[4] Mot. to Dismiss, No. 23-CV-4800, ECF No. 78; Mem. in Supp., No. 23-CV-4800, ECF No. 79; Mem. in Opp'n, No. 23-CV-4800, ECF No. 80; Reply in Supp., No. 23-CV-4800, ECF No. 81; Mot. to Dismiss, No. 23-CV-8687, ECF No. 53; Mem. in Supp., No. 23-CV-8687 ("Diocese Frost Mem."), ECF No. 54; Mot. to Dismiss, No. 23-CV-8687, ECF No. 57; Mem. in Supp., No. 23-CV-8687 ("St. Raphael Frost Mem."), ECF No. 58; Mem. in Opp'n, No. 23-CV-8687 ("Pl. Frost Mem."), ECF No. 59; Reply in Supp., No. 23-CV-8687 ("Diocese Frost Reply"), ECF No. 63; Reply in Supp., No. 23-CV-8687 ("St. Raphael Frost Reply"), ECF No. 60.

In his opposition papers, Lynch requested leave to further amend his complaint, which the Court granted while directing the Diocese and the Parish Defendants to file letters to the docket addressing the new allegations in the second amended complaints. Dkt. Order dated Nov. 10, 2025, No. 23-CV-4800; Dkt. Order dated Nov. 10, 2025, No. 23-CV-8687. Lynch filed his second amended complaints on November 24, 2025. Cunningham Compl.; Frost Compl. The Diocese and the Parish Defendants subsequently submitted their letters adhering to the arguments

---

[3] The Parish Defendants share common counsel, and the memoranda of law filed by St. Raphael and Good Shepherd in the Cunningham case appear to be identical. *Compare* No. 23-CV-4800, ECF No. 75, *with* No. 23-CV-4800, ECF No. 79. Accordingly, in the interest of concision, references to the "Parish Cunningham Mem." will cite to ECF No. 75 but refer to both ECF No. 75 and ECF No. 79.

[4] As with the Parish Defendants' memoranda in chief, their respective reply memoranda in the Cunningham case are identical. *Compare* No. 23-CV-4800, ECF No. 77, *with* No. 23-CV-4800, ECF No. 81. Accordingly, in the interest of concision, references to the "Parish Cunningham Reply" with cite to ECF No. 77 but refer to both ECF No. 77 and ECF No. 81.

advanced in their earlier motions to dismiss. Ltr., No. 23-CV-4800, ECF No. 97; Ltr., No. 23-CV-4800, ECF No. 98; Ltr., No. 23-CV-4800, ECF No. 99; Ltr., No. 23-CV-8687 ("Diocese Frost Ltr. Br."), ECF No. 78; Ltr., No. 23-CV-8687 ("St. Raphael Frost Ltr. Br."), ECF No. 79. Cunningham has answered the second amended complaint, Second Amended Answer, No. 23-CV-4800, ECF No. 101. Frost has yet to answer or otherwise respond to the second amended complaint.

In the Cunningham case, Lynch now advances nine causes of action: (1) battery against Cunningham; (2) assault against Cunningham; (3) false imprisonment against Cunningham; (4) negligence against all Defendants; (5) negligent hiring, retention, and supervision against the Diocese and the Parish Defendants; (6) gross negligence against the Diocese and the Parish Defendants; (7) intentional infliction of emotional distress against all Defendants; (8) negligent infliction of emotional distress against all Defendants; and (9) breach of fiduciary duty against all Defendants. Cunningham Compl. ¶¶ 103–96. The Diocese and the Parish Defendants have moved to dismiss counts four through nine. Diocese Cunningham Mem. at 7–9;[5] Parish Cunningham Mem. at 9–10.

In the Frost case, Lynch again advances nine causes of action: (1) battery against Frost; (2) assault against Frost; (3) false imprisonment against Frost; (4) negligence against all Defendants; (5) negligent hiring, retention, and supervision against the Diocese and St. Raphael; (6) gross negligence against the Diocese and St. Raphael; (7) intentional infliction of emotional distress against all Defendants;

---

[5] All page references are to ECF pagination unless otherwise noted.

(8) negligent infliction of emotional distress against all Defendants; and (9) breach of fiduciary duty against all Defendants.  Frost Compl. ¶¶ 103–99.  The Diocese and St. Raphael have also moved to dismiss counts four through nine.  Diocese Frost Mem. at 7–9; St. Raphael Frost Mem. at 7–9.

## LEGAL STANDARD

Where, as here, a defendant has moved to dismiss a complaint for failure to state a claim, courts must evaluate whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On the other hand, if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint must be dismissed.  *Twombly*, 550 U.S. at 558.  Courts at this stage "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor."  *Sacerdote*, 9 F.4th at 106–07.  However, courts need not accept legal conclusions and "threadbare recitals of a cause of action's elements."  *Iqbal*, 556 U.S. at 663.  Complaints that advance only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## DISCUSSION

As discussed *supra*, the Diocese and the Parish Defendants have moved to dismiss only the causes of action that seek to hold them liable.[6]  Accordingly, this opinion does not address counts one through three in either of the second amended complaints, since those causes of action seek to hold only Frost and Cunningham liable, and neither Frost nor Cunningham has moved to dismiss these claims. Because Lynch brings these cases pursuant to the Court's diversity jurisdiction, Frost Compl. ¶ 30; Cunningham Compl. ¶ 36, his claims are governed by New York substantive law, *Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 588 (2d Cir. 2021) ("In a diversity of citizenship case, state law . . . applies to substantive issues, and federal law applies to procedural issues.").

## I.    Ordinary Negligence Claims

Under New York law, a plaintiff can establish a *prima facie* case of negligence by showing that (1) a defendant owed him a duty; (2) the defendant breached that duty; and (3) plaintiff suffered injuries proximately resulting from that breach.  *Coyla v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).  "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party."  *Espinal v. Melville Snow Contractors, Inc.*, 773 N.E.2d 485, 487 (N.Y. 2002).  A plaintiff must also

---

[6] In its pre-motion conference letter in the Cunningham case, the Diocese advanced the argument that the complaint does not comport with Federal Rule of Civil Procedure 8.  Ltr. at 2–3, No. 23-CV-4800, ECF No. 47.  However, the Diocese has abandoned this argument in its motion papers, *see* Diocese Cunningham Mem. at 19 n.7; Diocese Frost Mem. at 21 n.7, and accordingly the Court will not consider it below.

establish that his injuries were foreseeable. *Aegis Ins. Servs. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013).

The dispute at this stage centers on whether the Diocese and the Parish Defendants owed any duty to Lynch. In both the Frost and Cunningham cases, Lynch advances the theory that these Defendants owed him a duty as landowners to protect him from what they knew to be the dangerous proclivities of Frost and Cunningham. Pl. Frost Mem. at 19–21; Pl. Cunningham Mem. at 17–19. In the Frost case, Lynch advances the alternative theory that the Diocese and St. Raphael also owed him a duty *in loco parentis* due to his enrollment at Cathedral Prep, a Diocesan school, at the time of the alleged abuse. Pl. Frost Mem. at 21–22.[7]

---

[7] Lynch also asserts, as another alternative theory in both cases, that the Diocese and the Parish Defendants "owed [him] a duty to protect him from the dangers arising out of [Frost's and Cunningham's] known propensit[ies] to commit sexual assault." Pl. Frost Mem. at 16; Pl. Cunningham Mem. at 14. This appears to assert that these Defendants are liable under the *respondeat superior* theory of vicarious liability. *See, e.g.*, *Riviello v. Waldron*, 391 N.E.2d 1278, 1280–81 (N.Y. 1979) (discussing *respondeat superior* liability under New York law). However, the cases Lynch cites to establish this duty concerned state-law negligent supervision claims, not claims for ordinary negligence. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) ("[The plaintiff] argues, as he did below, that the defendants are liable for [individual defendant-employee's] tortious conduct on a theory of negligent retention or supervision."); *O'Rear v. Diaz*, No. 24-CV-1669 (PAE), 2025 WL 283169, at *1 (S.D.N.Y. Jan. 23, 2025) ("[The plaintiff] brings, against the corporate defendants, claims of . . . negligent supervision under New York state law."). Lynch has cited no case, and the Court is not aware of any, where *respondeat superior* liability attached to an employer for a claim related to a sexual assault perpetrated by an employee. Courts in fact explicitly reject such theories because sexual assault is not within any employee's scope of employment. *See N.X. v. Cabrini Medical Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002) (finding a sexual assault perpetrated by a hospital employee did not make the hospital employer liable under *respondeat superior*); *In re Roman Cath. Diocese of Rockville Ctr.*, 651 B.R. 146, 161 n.5 (S.D.N.Y. Bankr. 2023) (collecting cases). Accordingly, the Court will not consider arguments evoking *respondeat superior*. However, the arguments adduced by Lynch on this point do

The Parish Defendants argue that they cannot be liable for the negligence causes of action in either case because, "to the extent the negligence claims rel[y] upon a premises liability theory, that claim must [] fail for failure to plead foreseeable harm." St. Raphael Frost Mem. at 14 (citing *A.M. v. Holy Resurrection Greek Orthodox Church of Brookville*, 135 N.Y.S.3d 823 (Mem) (N.Y. App. Div., 1st Dep't 2021)); Parish Cunningham Mem. at 15 (same). The Parish Defendants do not address Lynch's *in loco parentis* theory.

For its part, the Diocese argues that it cannot be liable as a landowner because "the Brooklyn Diocese is not the owner or operator of [either Parish church, where the alleged abuse occurred]." Diocese Frost Mem. at 15; Diocese Cunningham Mem. at 14; Diocese Frost Reply at 10–11; Diocese Cunningham Reply at 9–10. As to Lynch's *in loco parentis* theory, the Diocese contends that it cannot be liable because the Diocese is not a school, Lynch was not a student at either Parish when the alleged abuse occurred, and Lynch had turned 18 before the alleged abuse at issue in these cases. Diocese Frost Mem. at 14–15; Diocese Cunningham Mem. at 13–14; Diocese Frost Reply at 8–10; Diocese Cunningham Reply at 7–9.

The Court now considers each of these two theories of liability below, beginning with *in loco parentis*.

---

weigh in both (1) the Court's evaluation of Lynch's negligent hiring and supervision claims and (2) the issue of whether the Diocese and the Parish Defendants, as putative landowners, were on notice of a hazard from which they had a duty to protect Lynch as an invitee. The Court will discuss these arguments *infra*.

### a. Duty *In Loco Parentis*

"The concept of in loco parentis forms the basis of the duty owed by a school district to students within its charge in the context of a negligent supervision claim." *Guerriero v. Diocese of Brooklyn*, No. 21-CV-4923 (MKB) (*Guerriero I*), 2024 WL 2826097 (E.D.N.Y. Mar. 28, 2024) (citation modified) (quoting *Doe v. Hauppauge Union Free Sch. Dist.*, 184 N.Y.S.3d 150, 152 (N.Y. App. Div., 2d Dep't 2023)), *reconsideration denied*, 2024 WL 2826101 (May 22, 2024). The New York Court of Appeals has specifically noted "the general rule that a school's duty of care does not extend beyond school premises, and is limited to injury that occurred shortly after school hours upon the student's departure from the school." *Williams v. Weatherstone*, 15 N.E.3d 792, 801 (N.Y. 2014) (citation modified); *cf. Doe 1 v. Bd. of Educ. of Greenport Union Free Sch. Dist.*, 955 N.Y.S.2d 600, 602 (N.Y. App. Div., 2d Dep't 2012) (modifying a trial court order to dismiss claims where "all of the improper acts by [the school employee] took place off school premises and/or outside of school hours, when the school defendants had no custody or control of the infant plaintiff and no duty to monitor or supervise the conduct of [the school employee]").

Here, Lynch has alleged that Frost abused him while he was working in the St. Raphael rectory "after school and on the weekend," and has specifically alleged that Frost regularly abused him after finding him working alone "after school." Frost Compl. ¶¶ 45–48. As to Cunningham, Lynch alleges that the abuse occurred at Good Shepherd, not at Cathedral Prep. Cunningham Compl. ¶ 74. Nowhere in either of Lynch's complaints does he allege abuse that occurred on school premises, during

school hours, or shortly after the end of the school day while Lynch was leaving the Cathedral Prep campus.  For these reasons, Lynch has failed to show that Defendants had a putative duty towards him under an *in loco parentis* theory.  *See Vernali v. Harrison Cent. Sch. Dist.*, 857 N.Y.S.2d 699, 701 (N.Y. App. Div., 2d Dep't 2008) ("A school's custodial duty ceases once the student has passed out of its orbit of authority and the parent is perfectly free to reassume control over the child's protection. Generally, a school cannot be held liable for injuries that occur off school property and beyond the orbit of its authority." (citation omitted)); *Hansen v. Bath & Tennis Marina Corp.*, 900 N.Y.S.2d 365, 368 (N.Y. App. Div., 2d Dep't 2010) (finding a school was not liable for an injury that occurred during an off-campus meeting of a high school rotary club).  And because Lynch has failed to plead this element of an *in loco parentis* duty arising from a school/student relationship, the Court does not reach any of Defendants' further arguments on this issue.

### b.    Duty as Landowner

Under New York law, "landowners and business proprietors have a duty to maintain their properties in reasonably safe condition."  *Di Ponzio v. Riordan*, 679 N.E.2d 616, 618 (N.Y. 1997); *Maheshwari v. City of New York*, 810 N.E.2d 894, 897 (N.Y. 2004).  "This duty may extend to controlling the conduct of third persons who frequent or use the property, at least under some circumstances."  *Marasligiller v. City of New York*, 217 F. App'x 55, 57 (2d Cir. 2007).  A landowner has a duty to take protective measures against misconduct by a third party only if "it is shown that he either knows or has reason to know from past experience 'that there is a likelihood of

conduct on the part of third persons which is likely to endanger the safety of the visitor.'" *Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451, 458 (N.Y. 1980) (citation modified) (quoting Restatement (Second) of Torts § 344, cmt. f). If such notice is established, a landowner has a duty to undertake "minimal precautions to protect the public from reasonably foreseeable criminal acts of third persons." *Polomie v. Golub Corp.*, 640 N.Y.S.2d 700, 701 (N.Y. App. Div., 3d Dep't 1996).

"[S]uch a duty arises by virtue of the party's ownership and control of the property, for the obvious reason that the person in possession of property ordinarily is in the best position to discover and *control* its dangers." *Blatt v. N.Y.C. Hous. Auth.*, 506 N.Y.S.2d 877, 879 (N.Y. App. Div., 2d Dep't 1986) (citation modified). However, while "landlords and permittees have a common-law duty to minimize foreseeable dangers on their property, including the criminal acts of third parties, they are not the insurers of a visitor's safety." *Maheshwari*, 810 N.E.2d at 897. Thus, landowners only have a duty to protect tenants and visitors from criminal conduct by third parties when they have control over the premises and when the conduct is foreseeable. *See, e.g.*, *Karim v. 89th Jamaica Realty Co., L.P.*, 7 N.Y.S.3d 488 (N.Y. App. Div., 2d Dep't 2015) (denying a landlord's motion for summary judgment when a tenant operating a store at a bus terminal sued the landlord after being assaulted by a passerby in the waiting area when the landlord's security guard was not present).

The Diocese argues that it cannot be liable as a landowner because it does not own either St. Raphael or Good Shepherd, the churches where the alleged abuse took

place.  Diocese Cunningham Mem. at 14; Diocese Frost Mem. at 15–16.  The Diocese asks the Court to take judicial notice of deeds and other documents purporting to show that the Diocese is not the owner of either church.  *See generally* Decl. of Randall L. Morrison, Jr. dated Feb. 3, 2025, No. 23-CV-4800, ECF No. 71 (Good Shepherd documents); Reply Decl. of Randall L. Morrison, Jr. dated June 24, 2025, No. 23-CV-4800, ECF No. 83 (certified copies of same); Decl. of Randall L. Morrison, Jr. dated Feb. 3, 2025, No. 23-CV-8687, ECF No. 55 (St. Raphael documents); Reply Decl. of Randall L. Morrison, Jr. dated June 24, 2025, No. 23-CV-8687, ECF No. 63 (certified copies of same).  For their parts, the Parish Defendants assert that they cannot be held liable as landowners because the complaints "fail[] to plausibly allege that [the Parish Defendants] had prior notice of any dangerous condition on its property based on [Frost's and Cunningham's] propensity to commit sexual abuse."  Parish Cunningham Mem. at 9; St. Raphael Frost Mem. at 8.

Lynch contends that the Court should not take judicial notice of the deeds and other documents and, even if it did take such notice, that the deeds are not dispositive of the ownership question.  Pl. Frost Mem. at 19–21; Pl. Cunningham Mem. at 17–19.  Lynch also contends that Defendants were aware of the danger Frost and Cunningham posed.  Pl. Frost Mem. at 20; Pl. Cunningham Mem. at 18.

As an initial matter, the Court declines to take judicial notice of the deeds and other documents.  "In considering a motion to dismiss pursuant to Rule 12(b)(6), a court is generally limited to the complaint and documents attached thereto." *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 278 (E.D.N.Y.

2021).  A court may consider documents that are the "proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020).  "If, however, there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016).  "The 'no dispute' requirement has been interpreted strictly: even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible."  *See Guerriero v. Diocese of Brooklyn*, No. 21-CV-4923 (MKB) (*Guerriero II*), 2024 WL 2826101, at *3 (E.D.N.Y. May 22, 2024) (citation modified).

Here, Lynch disputes both the relevance and the authenticity of the documents.  Pl. Frost Mem. at 20; Pl. Cunningham Mem. at 18.  The Court also notes that, even if the documents' authenticity were not in dispute, formal ownership is not dispositive as to whether the Diocese owed a duty as landowner to Lynch.  *See Klein v. City & Cnty. Paving Corp.*, No. 16-CV-2264 (NRB), 2018 WL 4265885, at *4 (S.D.N.Y. Sep. 5, 2018) ("Legal ownership is not dispositive: a landowner not in possession and lacking control may not be liable, just as a tenant in possession and control may be liable.").  Lynch claims that the alleged abuse occurred "on premises owned *and/or controlled* by the Diocese and Parish."  Frost Compl. ¶ 37; Cunningham Compl. ¶ 31 (emphasis added).  Control, rather than just formal ownership, is at issue in this case.  *See Ritto v. Goldberg*, 265 N.E.2d 772, 774 (N.Y. 1970) ("It has been held uniformly that control is the test which measures generally the responsibility in tort of the owner of real property."); *Gronski v. County of Monroe*,

963 N.E.2d 1219, 1221–23 (N.Y. 2011) (summarizing case law and concluding that, even when an agreement is in writing, a court should look "not only to the terms of the agreement, but to the parties' course of conduct — including, but not limited to, the landowner's ability to access the premises"). And the documents that the Diocese relies upon do not determine whether it exercised such control here.

More relevant to that question is Lynch's allegation that the Diocese "placed" Frost in his position at St. Raphael, Frost Compl. ¶ 12, and affirmatively exercised its power to transfer Frost between different parishes, *id.* ¶ 75 ("[I]n 1999, the Diocese again transferred Frost, this time from Saint Raphael Parish to Corpus Christi Parish."). Lynch makes substantially the same allegations as to Cunningham. *See* Cunningham Compl. ¶ 18 ("[T]he Diocese placed Cunningham into parish assignments where he had unsupervised access to minors and young adults . . . ."); *id.* ¶ 133 ("The Diocese and the Parishes gave Cunningham unfettered access to minor children and young adults, including Mr. Lynch."). These allegations permit a reasonable inference that the Diocese affirmatively created dangerous conditions by appointing Frost and Cunningham to positions in the Parishes where they had unsupervised contact with minors, and thus may serve as a basis for liability for the Diocese. *See McNeish v. Lucky Mate Co.*, No. 15-CV-2924 (CBA) (PK), 2017 WL 6034121, at *2 (E.D.N.Y. Mar. 30, 2017) ("[E]ven absent a showing of continued control, liability may attach to an out-of-possession owner who has affirmatively created a dangerous condition or defect." (citation modified)).

The question of who owned or otherwise exerted control over the church buildings where the alleged abuse occurred is a factual determination inappropriate for resolution at the motion to dismiss stage. Accordingly, the Court does not take notice of the deeds and related documents and denies the Diocese's motion to dismiss the negligence claims on the basis of its putative lack of ownership over the churches.

### 1.  Notice of Frost's Alleged Dangerous Propensities

The Court next turns to Lynch's assertion that Defendants had actual notice of Frost's misconduct and his propensities for such misconduct prior to Frost's abuse of Lynch. Frost Compl. ¶ 50. That is a legal conclusion that the Court need not treat as true for purposes of this motion to dismiss. *See Murray v. Nazareth Reg'l High Sch.*, No. 20-CV-1471 (RJD) (RML), 2022 WL 3139116, at *4 (E.D.N.Y. Aug. 5, 2022) ("Such conclusory statements . . . are insufficiently specific in alleging that the Diocese had knowledge of [the alleged priest-abuser] propensities.").

However, Lynch has alleged facts from which a reasonable jury could conclude that Defendants had notice of Frost's dangerous propensities. Specifically, Lynch has alleged that (1) Frost was transferred from St. Mark's Church because of his known abuse of children there, Frost Compl. ¶ 53; (2) "the Diocese and [St. Raphael] possessed and maintained internal personnel-file records documenting that, years before abusing [Lynch], Frost had been the subject of reports and behavioral concerns related to inappropriate, sexualized and boundary-violating conduct toward minors and vulnerable parishioners, including but not limited to conduct reported during his tenure at St. Mark's Church," *id.* ¶ 54; and (3) the Diocese and St. Raphael were

aware of professional evaluations of Frost that concluded he engaged in sexually inappropriate behavior and innuendo with minors and vulnerable parishioners, *id.* ¶¶ 55–57.

Lynch has plausibly alleged that the Diocese and St. Raphael were aware of Frost's dangerous propensities and that these Defendants breached their duty as landowners to take reasonable steps to minimize the risk that Frost would abuse Lynch. *See Guerriero I*, 2024 WL 2826097, at *8 (denying a motion to dismiss a negligence claim based on a landowner's duty when, *inter alia*, "[d]efendants knew or should have known of [the priest-abuser's] propensities . . . and [d]efendants had the opportunity to control [the priest-abuser], as demonstrated by [d]efendants' transfer and eventual termination of [the priest-abuser]"). Because Lynch has also plausibly alleged that he was injured by Defendants' breach of their duty as landowners, Frost Compl. ¶¶ 90–96, 143, Lynch has stated a claim for negligence. Accordingly, the Diocese's and St. Raphael's motions to dismiss this claim in the Frost case are denied.

### 2.    Notice of Cunningham's Alleged Dangerous Propensities

Lynch's allegation that Cunningham was "an individual with a known propensity for sexual misconduct," Cunningham Compl. ¶ 131, is also conclusory. Unlike Lynch's allegations against Frost, however, Lynch's complaint in the Cunningham case does not contain factual allegations that, if proven, would support the conclusion that the Diocese and the Parish Defendants were on notice of Cunningham's alleged dangerous propensities.

The only facts Lynch alleges as to such dangerous propensities relate to a 1990 psychological evaluation of Cunningham that was prepared in connection with his admission to seminary and ordination. *Id.* ¶¶ 13–16. This evaluation concluded, *inter alia*, that Cunningham displayed (1) emotional immaturity; (2) difficulty forming healthy adult relationships; (3) constricted affect and inability to manage close interpersonal dynamics; (4) fear of anger and tendency to withdraw under stress; and (5) a pattern of avoiding intimacy and pushing people away when confronted with interpersonal conflict. *Id.* ¶ 13. Lynch contends that these "psychological evaluations constituted actual notice that Cunningham possessed traits . . . that are well-recognized risk indicators for boundary violations within clergy-parishioner relationships, particularly with vulnerable adolescents and young adults," *id.* ¶ 16, and that "[t]he Diocese and the Parishes had actual knowledge of Cunningham's predispositions through the psychological evaluation," *id.* ¶ 148.

The 1990 psychological report does not contain any references to Cunningham's potential or propensity to commit sexual abuse. The report's finding that Cunningham displayed a pattern of "avoiding intimacy" might even be interpreted to suggest that he was *not* at risk of grooming young parishioners to submit to sexual abuse. *Cf. Karim*, 7 N.Y.S.3d at 489 ("To establish that criminal acts were foreseeable, the criminal conduct at issue must be shown to be reasonably predictable based on the prior occurrence of the same or similar criminal activity at a location sufficiently proximate to the subject location."). Moreover, the complaint does not explain why the psychological issues identified in the 1990 report were, as

Lynch alleges, "inconsistent with safe pastoral ministry and required heightened supervision," Cunningham Compl. ¶ 148, or "well-recognized risk indicators for boundary violations within clergy-parishioner relationships," *id.* ¶ 16. These conclusory allegations are insufficient to establish that Cunningham's subsequent acts of sexual abuse were reasonably foreseeable. *Cf. Murray*, 2022 WL 3139116, at *3 ("Yet plaintiff provides no basis to support the assertion that multiple transfers are suspicious, says nothing of the explanation proffered for these transfers, and does not clarify how many transfers is unusual."). Accordingly, Lynch has not adequately alleged facts from which it may be said that the Diocese and the Parish Defendants knew about Cunningham's propensity for sexual abuse, or that would otherwise support a finding that his alleged abuse of Lynch was reasonably foreseeable.

Nor can Lynch's allegations about the Diocese's and the Parish Defendants' general awareness of "an alarming number of incidents involving Priests abusing minor boys and young adults" serve to make Cunningham's alleged abuse of Lynch foreseeable. "To be clear, including allegations . . . that [a diocese] knew about a problem of sexual abuse within the [d]iocese alone is not a sufficient allegation that the [d]iocese was on notice of a specific abuser's propensity for abuse." *In re Roman Cath. Diocese of Rockville Ctr.*, 651 B.R. at 174; *see also Murray*, 2022 WL 3139116, at *4 (discounting as "vague group pleading" an allegation that defendants "fail[ed] to properly investigate and report the known and tolerated pedophile activities of their clergy"); *Templeton v. Bishop of Charleston*, No. 18-CV-2003 (DCN), 2021 WL 4129223 (D.S.C. Sep. 9, 2021) (holding that "knowledge of a general concern of

pedophilia within the church is not the same as knowledge that [a specific priest] in particular posed a danger to others," despite evidence "suggesting that the Bishop knew 'there was a nest of pedophiles in the diocese'").

The Cunningham complaint does not adequately allege that the Diocese and the Parish Defendants had notice of Cunningham's propensity to commit sexual abuse. Accordingly, these Defendants' motions to dismiss the negligence claim in the Cunningham case are granted.

## II.    Negligent Hiring, Training, and Supervision Claims

"Under New York law, an employer can be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Ranta v. City of New York*, No. 14-CV-3794 (FB) (LB), 2024 WL 1332723, at *3 (E.D.N.Y. Mar. 28, 2024) (citation omitted). To state such a claim, "in addition to the negligence elements of such a claim, a plaintiff must show: '(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.'" *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam)). Courts sometimes cast the third element as requiring "a substantial nexus between [the employer's] negligent supervision and the harm [the plaintiff] suffered." *See, e.g.*, *Waterbury v. N.Y. City Ballet, Inc.*, 168

N.Y.S.3d 417, 425 (N.Y. App. Div., 1st Dep't 2022); *id.* at 423–26 (discussing this element).

### a.    Alleged Negligent Hiring, Retention, and Supervision of Frost

Defendants focus their briefing on the argument that the Diocese and St. Raphael did not have sufficient notice of Frost's alleged propensity to commit sexual abuse to be held liable on this theory. Diocese Frost Mem. at 17–21; St. Raphael Frost Mem. at 15–16; Diocese Frost Ltr. Br. at 2–4; St. Raphael Frost Ltr. Br. at 1–2. Additionally, the Diocese "does not concede that it employed Frost at the time of the alleged abuse" and asserts that Frost "worked for St. Raphael." Diocese Frost Mem. at 16. For his part, Lynch asserts that he has adequately pleaded notice of Frost's dangerous propensity, Pl. Frost Mem. at 12–15, and contends that "Frost was an employee of both the Diocese (which was responsible for overseeing both Frost and the Parish, and which assigned Frost to work at the Parish) and of the Parish, for which Frost was directly employed," *id.* at 16.

As to the first element of a negligent supervision claim, the complaint in the Frost case alleges that the Diocese maintained significant control over Frost's employment, including appointing him to his position at St. Raphael, notwithstanding any sole, formal employment relationship between Frost and St. Raphael. Frost Compl. ¶¶ 6–9, 12. At the motion to dismiss stage, this is sufficient to allege that the Diocese and St. Raphael were Frost's joint employers. *See Guerriero I*, 2024 WL 2826097, at *3 n.4 ("The Court . . . considers St. Bernadette and the Diocese as joint employers for purposes of this motion."); *LaFrantz v. St. Mary's*

*Roman Cath. Church*, No. 21-CV-4920 (NGG) (CLP), 2024 WL 216718, at *3 (E.D.N.Y. Jan. 19, 2024) ("Drawing all reasonable inferences in [the p]laintiff's favor, the court . . . considers the Brooklyn Diocese and St. Mary's as joint employers for purposes of this motion."); *cf. Samide v. Roman Cath. Diocese of Brooklyn*, 754 N.Y.S.2d 164, 172 (N.Y. Sup. Ct., Queens Cnty. 2003) (finding, under the New York State Human Rights Law, that a diocese and a parish were joint employers of the plaintiff because, *inter alia*, (1) the diocese was alleged to be "the governing body of the [p]arish"; (2) the parish's certificate of incorporation indicated that the diocese possessed "ecclesiastical jurisdiction" over churches and societies within the county where the parish was located; and (3) the plaintiff's employment with the parish school was subject to an employee handbook distributed by the diocese). Accordingly, Lynch's complaint has adequately alleged the first element of a negligent supervision claim, that the Diocese and St. Raphael were in an employee-employer relationship with Frost.

For substantially the same reasons outlined *supra* regarding the ordinary negligence claim, Lynch has also sufficiently alleged that the Diocese and St. Raphael had notice of Frost's dangerous propensities. Frost Compl. ¶¶ 51, 53–57. These allegations of earlier, specific conduct by Frost implicate conduct that is fundamentally similar to the abuse Lynch allegedly experienced. *See Doe v. Alsaud*, 12 F. Supp. 3d 674, 680–81 (S.D.N.Y. 2014) (noting that an employer "is only liable for negligent supervision or retention if it is aware of specific prior acts or allegations against the employee" and "[t]he prior misconduct[] must be of the same kind that

caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient").

Moreover, the alleged abuse occurred on St. Raphael property, specifically in the rectory, while Lynch was working as an altar boy. Frost Compl. ¶¶ 53–57. Whether the final element is framed as requiring that the injury occurred on the property of the employer, with the chattels of the employer, or that the injury had a nexus with Frost's employment as a priest, the complaint has sufficiently alleged this third element. In other words, Lynch has plausibly alleged that negligence on the part of the Diocese and St. Raphael, Frost's alleged joint employers, was the proximate cause of his injury. *See Waterbury*, 168 N.Y.S.3d at 424 (noting that the negligent supervision nexus requirement "means that the employer's negligence must be a proximate cause of the plaintiff's injury"); *cf. Roe v. Domestic & Foreign Missionary Soc'y of the Protestant Episcopal Church*, 155 N.Y.S.3d 418, 421–22 (N.Y. App. Div., 2d Dep't 2021) (finding no nexus where "the sexual assault occurred far from the Church's premises, and there is no allegation in the complaint that the plaintiff had any prior contact with the alleged attacker, any prior relationship with any of the defendants, or even any knowledge, at the time of the sexual assault, that the alleged attacker was employed by the defendants").

Lynch has sufficiently pleaded a negligent hiring and supervision claim in the Frost case. Accordingly, the Diocese's and St. Raphael's motions to dismiss this claim in the Frost case are denied.

### b. Alleged Negligent Hiring, Retention, and Supervision of Cunningham

In contrast, Lynch's negligent supervision claim against the Diocese and the Parish Defendants in the Cunningham case fails. As discussed *supra*, the complaint does not adequately allege that the findings in Cunningham's psychological evaluation at the time of his ordination alerted Defendants to any dangerous propensity to commit sexual abuse. The failure to sufficiently plead such facts means that, in the Cunningham case, Lynch has failed to plead negligence on the part of the Diocese and the Parish Defendants, which is a necessary element of a negligent supervision claim. *Rich*, 939 F.3d at 129. This also means that the complaint does not adequately plead the second element of a negligent supervision claim, which requires Lynch to plead that the Diocese and the Parish Defendants had knowledge of specific acts or allegations that were of a similar kind to the abuse Lynch allegedly experienced at the hands of Cunningham. *Doe*, 12 F. Supp. 3d at 680–81. Accordingly, the Diocese's and the Parish Defendants' motions to dismiss this claim in the Cunningham case are granted.

## III. Gross Negligence Claims

"Under New York law, a claim for gross negligence, like ordinary negligence, requires breach of a legal duty." *Murray*, 2022 WL 3139116, at *4 (citing *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)); *see also Pasternack v. Lab'y Corp. of Am.*, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) (noting that a plaintiff must establish the elements of ordinary negligence to prevail on a gross negligence claim (citing *AT & T v. City of New York*, 83 F.3d 549, 556 (2d Cir.1996))). However, "gross negligence is

a tort differing from ordinary negligence in kind rather than degree.  Gross negligence implies willful or intentional misconduct." *Mindspirit, LLC v. Evalueserve Ltd.*, No. 15-CV-6065 (PGG), 2016 WL 11707410, at *10 (S.D.N.Y. Sep. 26, 2016) (citation modified) (quoting *Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 993 (S.D.N.Y. 1984)).  "To constitute gross negligence, a party's conduct must 'smack of intentional wrongdoing' or 'evince a reckless indifference to the rights of others.'" *Ryan v. IM Kapco, Inc.*, 930 N.Y.S.2d 627, 629 (N.Y. App. Div., 2d Dep't 2011) (quoting *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1371 (N.Y. 1992)).  Recklessness in this context means "an extreme departure from the standards of ordinary care," such that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (citation omitted).

The Diocese and the Parish Defendants argue that if Lynch's ordinary negligence claims fail, so too do his gross negligence claims.  Diocese Frost Mem. at 21; St. Raphael Frost Mem. at 10–11; Diocese Cunningham Mem. at 19–20; Parish Cunningham Mem. at 17.  As to the gross negligence claim in the Frost case specifically, the Diocese and St. Raphael contend that Lynch's complaint fails to plead non-conclusory facts demonstrating reckless conduct on their part.  Diocese Frost Mem. at 22; St. Raphael Frost Mem. at 17.  The Diocese further contends that the complaint does not plead facts establishing that it was on notice of a prior history of inappropriate conduct by Frost, and that Lynch's allegations are merely speculative. Diocese Frost Mem. at 22.

Lynch argues that his ordinary negligence claims succeed, which defeats this aspect of Defendants' challenge to his gross negligence claims.  Pl. Frost Mem. at 23; Pl. Cunningham Mem. at 20.  As to Frost, Lynch further argues that the Diocese and St. Raphael protected Frost by transferring him between assignments despite their knowledge of his history of sexual abuse.  Pl. Frost Mem. at 23–24.  Lynch asserts that by so doing, the Diocese and St. Raphael created a risk that Frost would abuse vulnerable parishioners again.  *Id.* at 24.

### a.    Gross Negligence as to Frost

As discussed *supra*, Lynch alleges that the Diocese and St. Raphael had specific knowledge of Frost's earlier acts of sexual abuse, and these Defendants were informed that Frost had exhibited psychological indications of a proclivity for sexual misconduct.  Frost Compl. ¶¶ 51, 53–57.  Lynch also alleges that Frost was not punished for this earlier sexual misconduct and instead "was moved from parish to parish to cover up, and hide from, claims of sexual abuse."  *Id.* ¶ 72.  Lynch characterizes this conduct as "the Diocese and [St. Raphael] conspir[ing] to accommodate and conceal" Frost's sexual abuse.  *Id.* ¶ 73.  In short, Lynch alleges that the danger Frost posed was "known to the [D]efendant[s] or so obvious that the defendant must have been aware of it."  *AMW Materials Testing*, 584 F.3d at 454 (citation omitted).

These allegations are sufficient to state a gross negligence claim against the Diocese and St. Raphael in the Frost case.  *See Belcastro v. Roman Cath. Diocese of Brooklyn*, 184 N.Y.S.3d 367, 370 (N.Y. App. Div., 2d Dep't 2023) (holding that

"allegations that the [defendants] knew of the sexual abuse, condoned it, covered it up, and intentionally failed to prevent it were sufficient to allege a cause of action to recover damages for gross negligence"). Accordingly, the Diocese's and St. Raphael's motions to dismiss this claim in the Frost case are denied.

### b. Gross Negligence as to Cunningham

As discussed *supra*, the complaint in the Cunningham case fails to plead sufficient facts to support an ordinary negligence claim against the Diocese and the Parish Defendants. For this reason, Lynch's gross negligence claim, which requires, *inter alia,* that he establish the elements of ordinary negligence, must fail. *See Pasternack*, 892 F. Supp. 2d at 552 ("Where a claim for ordinary negligence fails, a gross negligence claim necessarily fails."). Accordingly, the Diocese's and the Parish Defendants' motions to dismiss this claim in the Cunningham case are granted.

## IV. Intentional Infliction of Emotional Distress Claims

Lynch raises intentional infliction of emotional distress claims in both the Frost and Cunningham cases. Specifically, Lynch alleges that Frost and Cunningham conspired with each other, the Diocese, and the Parish Defendants "to conceal their sexual abuse and subject[] [Lynch] to a traumatizing confrontation with his abusers." Frost Compl. ¶ 176; Cunningham Compl. ¶ 174.

This claim principally relates to the February 1997 meetings between Lynch and his alleged abusers, which occurred after Lynch had reported the alleged abuse by Frost and Cunningham to Auxiliary Bishop Catanello. Frost Compl. ¶¶ 81–89; Cunningham Compl. ¶¶ 78–86. Lynch alleges that these meetings "were designed

34

and orchestrated to intimidate Mr. Lynch and prevent him from pursuing or officially reporting his claims." Frost Compl. ¶ 85; Cunningham Compl. ¶ 82.

Before addressing whether Lynch's complaints plead the essential elements of claims for intentional infliction of emotional distress, the Court first considers the Diocese's and the Parish Defendants' arguments that these claims are time-barred because they are not subject to the revived statute of limitations in the Adult Survivors Act. Diocese Frost Mem. at 22–25; St. Raphael Frost Mem. at 17–19; Diocese Cunningham Mem. at 20–23; Parish Cunningham Mem. at 18–21. Specifically, the Court must determine whether the acts and/or omissions of the Diocese and the Parish Defendants fall under the ASA because the injuries these Defendants allegedly caused Lynch — specifically, through the intentional infliction of emotional distress in the wake of Lynch's sexual abuse by Frost and Cunningham — may fairly be deemed the "result of" these priests' sexual misconduct, as that term is used in the ASA. *See* N.Y. C.P.L.R. § 214-j.

### a.    Claims Encompassed by the Adult Survivors Act

The Diocese contends that "[t]he meeting[s] with Diocesan representatives in February 1997 [] d[id] not involve any criminal conduct [unlawful under Article 130 of the New York Penal Law] and therefore do[] not fall under the suspension of statute of limitations allowed by the ASA." Diocese Cunningham Mem. at 21; *see also* Diocese Frost Mem. at 23. The Diocese further argues that (1) the "February 1997 meeting[s] w[ere] a distinct event from [Lynch's] sexual abuse allegation"; (2) Lynch's complaints indicate he viewed the meetings as distinct from the underlying alleged abuse; and

(3) "without a defined sexual violation occurring during the meeting[s], the ASA does not revive the [intentional infliction of emotional distress] claim."  Diocese Cunningham Mem. at 22–23; Diocese Frost Mem. at 24–25.

The Parish Defendants advance substantially similar arguments.  They assert that "the plain meaning of the ASA limits the revivable causes of actions is to [sic] actions 'constituting a sexual offense.'"  St. Raphael Frost Mem. at 18–19 (citation modified) (quoting *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645 (S.D.N.Y. 2024)); Parish Cunningham Mem. at 19 (same).  They further contend that "courts uphold the plain reading of the ASA, affirming that the 'conduct' in question must itself be a 'sexual offense.'"  St. Raphael Frost Mem. at 19 (citing cases); Parish Cunningham Mem. at 20 (same).  The Parish Defendants conclude that "the private February 1997 meeting[s] could not form the predicate for an ASA claim because no sexual criminal conduct took place at th[ose] meeting[s]."  St. Raphael Frost Mem. at 19; Parish Cunningham Mem. at 20.

Lynch counters that his intentional infliction of emotional distress claims "are not based on the [February 1997] forced confrontation alone" but instead "concern[] the sexual assaults [Lynch] suffered because of the [Diocese's and the Parish Defendants'] intentional, reckless, and negligent acts."  Pl. Frost Mem. at 24; Pl. Cunningham Mem. at 21.  Lynch further argues that his intentional infliction of emotional distress claims "are timely because they arise out of, and include," the abuse he alleged that he experienced from Frost and Cunningham.  Pl. Frost Mem. at 24; Pl. Cunningham Mem. at 21.

This dispute requires the Court to consider the types of claims revived by the ASA — and in particular, whether certain defendants who are alleged to have enabled or facilitated sexual abuse by others may be covered by the Act.

In relevant part, the text of the ASA reads:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary[,] . . . *every civil claim or cause of action* brought against *any party* alleging *intentional or negligent acts or omissions* by a person for physical, psychological, or other *injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law* committed against such person who was eighteen years of age or older . . . which is barred as of the effective date of this section because the applicable period of limitation has expired[,] . . . is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

N.Y. C.P.L.R. § 214-j (emphasis added).[8]

"The goal of a court interpreting a New York statute is 'to ascertain and give effect to the intention of the Legislature.'" *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 662 (S.D.N.Y. 2024) (quoting *People v. Andujar*, 88 N.E.3d 309, 313 (N.Y. 2017)). "As the clearest indicator of legislative intent is the statutory text, the

---

[8] The Court notes that the ASA contains very similar language to the earlier Child Victims Act (the "CVA"), which revived claims for individuals who suffered sexual abuse as children. *See Carroll v. Trump*, 650 F. Supp. 3d 213, 222 (S.D.N.Y. 2023) ("Just three years later – using almost precisely the same statutory language [as the CVA] – [the New York Legislature] came to the same view and the same result as to adult survivors, the ASA."). Where statutes use similar language and have similar purposes, courts should interpret such statutes similarly. *Wasser v. N.Y. State Off. of Vocational & Educ. Servs. for Individuals with Disabilities*, 602 F.3d 476, 479 (2d Cir. 2010) (citing *Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam)). Accordingly, the Court will consider cases that interpreted the scope of the CVA's revival provision in interpreting the scope of the ASA's substantially similar provision. *See Levin*, 747 F. Supp. 3d at 661 ("[C]ourts have interpreted the ASA by reference to the CVA.").

starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 696 N.E.2d 978, 980 (N.Y. 1998).

The phrases "every civil claim or cause of action" and "any party," which are not meaningfully in dispute here, have been interpreted broadly by the courts. *See, e.g.*, *Levin*, 747 F. Supp. 3d at 662–63 (construing the ASA). The question here is whether the emotional distress that Lynch alleges was inflicted by the Diocese and the Parish Defendants qualifies as an injury caused "as a result of" Frost's and Cunningham's sexual abuse of Lynch under the ASA. Answering this question also requires the Court to consider the meaning of the phrase "intentional or negligent acts or omissions" as used in the statute.

First, the Diocese and the Parish Defendants contend that the February 1997 meetings could only serve as a predicate to a revived ASA claim if sexual abuse unlawful within the meaning of Article 130 of the Penal Law actually occurred at the meetings. This argument is plainly foreclosed by the text of the ASA. The ASA contemplates reviving claims predicated on either "intentional *or negligent acts or omissions*." N.Y. C.P.L.R. § 214-j (emphasis added). As the *Levin* Court noted, "[t]he lowest grade of sexual offense under Article 130 is forcible touching," which requires intentionality on the part of the perpetrator; unlike the ASA, Article 130 does not apply to negligent acts. 747 F. Supp. 3d at 660. Similarly, the New York Court of Appeals has stated that, for more serious offenses under Article 130, "intent is implicitly an element of these crimes." *People v. Williams*, 614 N.E.2d 730, 737 (N.Y.

1993) (discussing the forcible compulsion element of rape, first degree and sodomy, first degree).

Indeed, as the statutory language strongly indicates, and as a number of New York state courts have found, it appears that Article 130 sex offenses cannot be committed by negligence, accident, or omission. *See* N.Y. Penal Law § 130.00(3) ("'Sexual contact' means any touching of the sexual or other intimate parts of a person *for the purpose of* gratifying sexual desire of either party." (emphasis added)); *In re Joel H.*, 718 N.Y.S.2d 347, 348 (N.Y. App. Div., 1st Dep't 2001) (noting that "intent to obtain sexual gratification" is an "element" of crimes under Article 130 (citing N.Y. Penal Law § 130.00(3))); *People v. Farrell*, 37 N.Y.S.3d 805, 807 (N.Y. App. Div., 4th Dep't 2016) (noting that "intent to engage in sexual contact" is "necessary" to establish an "act of sexual contact" (citing N.Y. Penal Law § 130.00(3))); *People v. Guerra*, 577 N.Y.S.2d 296, 298 (N.Y. App. Div., 2d Dep't 1991) (reversing a conviction for three counts of sexual abuse in the first degree under Article 130 because "the People failed to prove beyond a reasonable doubt that the defendant's intent was to obtain sexual gratification").[9]  That the ASA expressly revives certain claims arising from *negligent* acts or omissions thus defeats the far narrower reading of the statute offered by the Diocese and the Parish Defendants.

---

[9] The conclusion that offenses under Article 130 require some form of intentionality is reinforced by decisions concerning sexual abuse in the context of civil torts. *See Schmidt v. Bishop*, 779 F. Supp. 321, 325 (S.D.N.Y. 1991) ("It is thus legally impossible to claim that the alleged perpetrator of deliberate sexual abuse injured the plaintiff negligently.").

Moreover, to the extent that the plain text of the statute does not adequately reveal the Legislature's intent, the Court may look to extrinsic materials to aid its construction. *Carroll v. Trump*, 650 F. Supp. 3d 213, 222 (S.D.N.Y. 2023) (quoting 97 N.Y. Jur.2d, Statutes § 164 (2d ed. 2022)).  Here, both the legislative memorandum submitted with Assembly Bill 648A and the committee report produced with Senate Bill 66, both of which became the ASA, contained the following paragraph, which specifically contemplates revived claims against certain "enablers" — not only the perpetrators — of sexual abuse:

> This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct.  Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser *or their abuser's enablers* in a court of law.

*Carroll*, 650 F. Supp. 3d at 220–21 (citation modified) (emphasis added).

Indeed, courts interpreting the CVA by reference to its legislative history have noted that the statute's reach was intended to cover both those who directly perpetrate sexual abuse and those who serve as "enablers":

> The CVA is a legislative acknowledgment of the unique character of sex crimes against children, which can have a multitude of effects upon victims, including being justifiably delayed in otherwise timely taking action against their abusers *and/or those who facilitated their abuse . . . .*  In enacting these reforms the legislature also recognized that certain abusers—*sometimes aided by institutional enablers and facilitators*—have been successful in *covering up* their heinous acts against children.

*S. H. v. Diocese of Brooklyn*, 167 N.Y.S.3d 171, 186 (N.Y. App. Div., 2d Dep't 2022) (citation modified) (citations omitted) (emphasis added).

40

In light of the ASA's legislative history and the persuasive construction of the CVA, the ASA thus appears to contemplate extending liability to at least some third parties who, through their actions or omissions, facilitated or allowed abuse to occur and/or who have acted to cover up sexual abuse perpetrated by others — thereby allowing the abuser to escape detection or punishment and potentially permitting the abuse to continue.

The foregoing informs the Court's interpretation of the phrase "injury or condition suffered *as a result of* conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law" contained within the ASA. N.Y. C.P.L.R. § 214-j (emphasis added).   Courts have noted that "the ASA's limitations are injury-specific." *Levin*, 747 F. Supp. 3d at 664.  Accordingly, the Court must evaluate how the complaint, on the one hand, connects the conduct of third parties (here, the Parish and Diocese Defendants) to the alleged sexual abuse and, on the other hand, connects the conduct of these third parties to the Plaintiff's alleged injury.

Both the Diocese and the Parish Defendants assert that "[t]he ASA revives only those claims that seek relief from an injury *caused by* conduct that constitutes a predicate sexual offense under Article 130 of the Penal Law."  Diocese Frost Mem. at 24 (emphasis added) (quoting *Levin*, 747 F. Supp. 3d at 664); Diocese Cunningham Mem. at 22 (same); St. Raphael Frost Mem. at 19 (same); Parish Cunningham Mem. at 20 (same).  However, as discussed *supra*, this construction cannot mean that only persons who directly perpetrate criminal sex offenses can be sued under the ASA's

revived statute of limitations.  Such an interpretation would ignore the intent of the Legislature to extend liability to certain third parties and read out of the statute the provision that revives claims predicated on "negligent acts or omissions."

The Diocese and the Parish Defendants, however, advance precisely this construction.  As the Diocese puts it, "the conduct in question must itself be a sexual offense."  Diocese Frost Mem. at 24 (citation modified); Diocese Cunningham Mem. at 22 (citation modified).  They cite two cases decided in the Southern District of New York, *Levin*, 747 F. Supp. 3d 645, and *Reid v. McKelvey*, No. 22-CV-10708 (JGLC) (OTW), 2024 WL 4345585 (S.D.N.Y. Sep. 30, 2024).  Diocese Frost Mem. at 24; Diocese Cunningham Mem. at 22; St. Raphael Frost Mem. at 19; Parish Cunningham Mem. at 20.  Both cases are distinguishable.

In *Levin*, the plaintiffs contended that a private college had been negligent in running its academic programs, allegedly permitting an abuser to manipulate and ultimately abuse the plaintiffs.  747 F. Supp. 3d at 664–65.  Unlike the instant case, *Levin* did not concern potential third-party liability for a claim of intentional infliction of emotional distress.  Instead, in dismissing the plaintiffs' claims against the college, the *Levin* Court concluded that the plaintiff's allegations against the college "[did] not rest on allegations of fact that any [p]laintiff was the victim of a violation of Article 130."  *Id.* at 664–65.  The court further observed that "even if [p]laintiffs did adequately plead injuries suffered as a result of conduct that would constitute a sexual offense as defined in Article 130, [p]laintiffs nonetheless do not allege that [the college] proximately caused [p]laintiff's injuries and therefore fail to allege that their

state-law claims against [the college] arise from those injuries." *Id.* at 668 (citation modified); *see also id.* ("That is, the off-campus injuries [p]laintiffs allege do not give rise to [p]laintiffs' negligence claims against [the college] and therefore cannot support application of the ASA."); *id.* at 668–69 (conducting a proximate cause analysis). *Levin* involved different factual allegations and different kinds of claims, and Defendants' reliance on that decision to argue that Lynch's claims fall outside the ASA's scope is misplaced.

In *Reid*, the Court dismissed a claim of intentional infliction of emotional distress against a publishing company arising from its publication of a book, written by one of the plaintiff's alleged abusers, which contained a description of a sexual assault that had occurred sixteen years before the book's publication (but in which the author denied being present when Reid was assaulted by others). *Reid v. McKelvey*, No. 22-CV-10708 (JGLC) (OTW), 2024 WL 4264896, at *1–2 (S.D.N.Y. Aug. 14, 2024), *supplemented*, 2024 WL 4264855 (Aug. 23, 2024), *and report and recommendation adopted in part and modified in part*, 2024 WL 4345585 (S.D.N.Y. Sep. 30, 2024). In a portion of the report and recommendation that was adopted by the district court, the magistrate judge concluded that "the CVA does not apply to [p]laintiff's . . . intentional infliction of emotional distress claim[] against [the publishing company] because . . . [intentional infliction of emotional distress] arising out of the publication of a book do[es] not constitute a sexual offense under New York criminal law." *Id.* at *2. The district court, in adopting the report and recommendation, held that Reid's intentional infliction of emotional distress claim

was not covered by the ASA, because "the injuries stemming from the alleged . . . [intentional infliction of emotional distress] are distinct from those injuries that were as a result of conduct which would constitute a sexual offense under Article 130." *Reid*, 2024 WL 4345585, at *4 (citation omitted).

But again, *Reid* is distinguishable from Lynch's case in several key respects. First, the plaintiff did not appear to plead that the book's publishers had anything to do with the sexual assault or its immediate aftermath; as discussed *supra*, the book simply contained an account of the alleged assault, in which one of the plaintiff's alleged assailants denied his own participation, but did not dispute that she may have been victimized by others. That contrasts strongly with the allegations here: that the Diocese and the Parish Defendants responded to Lynch's reporting his abuse by "order[ing] [] Lynch to attend [] meeting[s] and—without warning or support— forc[ing] him to face Frost and Cunningham one after the next." Frost Compl. ¶ 20; Cunningham Compl. ¶ 26. Lynch also alleges that the purpose of the February 1997 meetings was "to intimidate [] Lynch and prevent him from pursuing or officially reporting his claims." Frost Compl. ¶ 85; Cunningham Compl. ¶ 82. Second, the publication of the book in *Reid* occurred sixteen years after the alleged assault. Here, Lynch asserts that the February 1997 meetings occurred "shortly after [Lynch] contact[ed] Auxiliary Bishop Catanello" to report the abuse. Frost Compl. ¶ 83; Cunningham Compl. ¶ 80. In short, Lynch alleges that the February 1997 meetings were (1) an immediate and direct response by the Diocese and the Parish Defendants to his reporting the abuse and (2) a deliberate attempt to intimidate him into silence.

44

Notably, in *Reid*, the "[p]laintiff ha[d] failed to allege that [the publishing company] . . . intended to cause [p]laintiff severe emotional distress." *Reid*, 2024 WL 4264896, at *3. Put another way, the *Reid* plaintiff did not allege that the publishing company's publication of the book was in any way intended to facilitate, cover up, or otherwise enable the perpetrator(s) of the alleged sexual assault. As such, *Reid* bears little on the question of whether the claims against the Diocese and the Parish defendants fall under the ambit of the Adult Survivors Act.

Defendants do not cite *Bensky v. Indyke*, 743 F. Supp. 3d 586 (S.D.N.Y. 2024), which is far more relevant and persuasive. In *Bensky*, the court considered, *inter alia*, an intentional infliction of emotion distress claim brought by a Jane Doe plaintiff on behalf of a class of alleged victims against an accused abuser's lawyer and accountant; the complaint accused them of working to cover up the abuser's trafficking and sexual abuse. 743 F. Supp. 3d at 598–99. This putative class claim covered conduct from 1995 to 2019. *Id.* at 591. And while the decision does not expressly hold that the intentional infliction of emotional distress claim was revived by the ASA, the class complaint in that case did invoke the ASA to render timely its otherwise time-barred claims. Compl., No. 24-CV-1204 (S.D.N.Y. Feb. 16, 2024), ECF No. 1.

The allegations in *Bensky* brought under the ASA's expanded statute of limitations included that the lawyer and the accountant (1) served as the abuser's moneymen as part of a complex sex trafficking operation; (2) kept the flow of hush money funds "under the radar" by, among other conduct, providing false reasons for

45

cash withdrawal; (3) personally approved and justified millions in dollars of payments to keep victims quiet or available; (4) controlled the abuser's business affairs, which were intended to conceal the trafficking operation; and (5) did all this with the knowledge that they were facilitating the trafficking operation. 743 F. Supp. 3d at 590–91. The *Bensky* Court denied the defendants' motion to dismiss the intentional infliction of emotional distress claims. *Id.* at 598–99.

The predicate conduct for the intentional infliction of emotional distress claim against the defendant-lawyer and defendant-accountant did not itself amount to a sexual offense covered by Article 130 of New York's Penal Law. Rather, the claims arose from defendants' role in concealing and facilitating their client's sex trafficking operation, which in turn encompassed conduct that violated Article 130. *Id.*

Lynch makes analogous allegations here. He alleges that the February 1997 meetings were designed to "intimidate" Lynch and "safeguard[] and protect[]" Frost and Cunningham. Frost Compl. ¶¶ 84–85; Cunningham Compl. ¶¶ 81–82. Lynch further alleges that the effort in his case to cover up abuse and deter victims from reporting was part of a "known pattern" whereby "the Diocese and the Parishes did their best to hide, conceal and cover up" scandalous abuse allegations. Frost Compl. ¶ 97; Cunningham Compl. ¶ 96. The Diocese and the Parish Defendants allegedly accomplished this intimidation by ambushing Lynch with face-to-face, one-on-one meetings with the same priests he had only recently accused of sexual abuse. Frost Compl. ¶¶ 83–85; Cunningham Compl. ¶¶ 80–82.

The Court concludes that Lynch has plausibly alleged that the injuries he experienced because of the February 1997 meetings were suffered "as a result of" sexual offenses within the meaning of Article 130.  As pleaded, the February 1997 meetings were not separate, distinct events — they were a continuation of the alleged abuse Lynch suffered, in that the meetings represented a deliberate attempt to cover up abuse that constituted sexual offenses under Article 130.  The complaint also alleges that this was part of a pattern of conduct that facilitated and enabled sexual abuse of minors and young adults in the Diocese, including by priests such as Frost who were known to the Diocese and the Parish Defendants to be abusers.  Assuming the facts in Lynch's complaint to be true, as the Court must for purposes of these motions to dismiss, the "acts and omissions" of the Diocese and the Parish Defendants fall within the ASA's scope.  There is a sufficient nexus between these Defendants' alleged cover-up of the sexual abuse that Lynch had just reported to them and the underlying abuse that Lynch alleged he endured at the hands of Frost and Cunningham to establish that Lynch's intentional infliction of emotion distress claims are "tied to an alleged violation of New York criminal law."[10]  *Holloway v. Holy See*, 537 F. Supp. 3d 502, 505 n.2 (S.D.N.Y. 2021).

---

[10] The presence of Frost and Cunningham at the February 1997 meetings, where Lynch alleges that he was forced to recount the abuse he experienced first in Frost's presence, and then separately in Cunningham's, is a significant allegation that ties these meetings directly to the abuse.  The Court need not consider whether different allegations (for example, that an institution covered up abuse allegations without arranging for the accused abusers to personally confront the alleged victim) would fall within the ASA's revival provision.

Accordingly, the Court concludes that the ASA serves to revive Lynch's intentional infliction of emotional distress claims in both the Frost and Cunningham cases, and each of these claims is timely.

### b. Intentional Infliction of Emotion Distress Related to the February 1997 Meetings

Having concluded that the intentional infliction of emotional distress claims in the Frost and Cunningham cases are subject to the ASA's extended statute of limitations, the Court next evaluates whether Lynch adequately pled these claims. Under New York law, the "tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).

The Diocese asserts that Lynch has insufficiently alleged extreme and outrageous conduct, in that Lynch's "sole factual allegation that he was called into one meeting to confront his accused perpetrators does not rise to the level of conduct so extreme and outrageous as to be utterly intolerable in a civilized society." Diocese Frost Mem. at 25; Diocese Cunningham Mem. at 23–24. The Parish Defendants similarly contend that "[t]he factual allegation that [Lynch] was called into a single meeting, months after the sexual abuse ended and after [Lynch] reported the abuse, to confront his accused perpetrators does not rise to the level of conduct so extreme and outrageous as to be utterly intolerable in a civilized society." St. Raphael Frost Mem. at 20; Parish Cunningham Mem. at 20.

The Court disagrees.  "Covering up sexual abuse can, depending on the facts, be 'sufficiently outrageous.'"  *Bensky*, 743 F. Supp. 3d at 599 (quoting *Eskridge v. Diocese of Brooklyn*, 180 N.Y.S.3d 179, 181 (N.Y. App. Div., 2d Dep't 2022)).  Lynch alleges that the Diocese and the Parish Defendants sought to cover up Frost's and Cunningham's abuse by calling Lynch into meetings at which he was forced to recount the details of his abuse in front of both of his abusers, actions that Defendants took for the purpose of intimidating him into silence about what he had endured.  This conduct is sufficiently extreme and outrageous to survive a motion to dismiss.  In addition, Lynch's claim is supported by his allegation about the actions that Defendants took against his mother, a longtime Parish employee, after he reported the abuse:

> At the time of this meeting, Mr. Lynch's mother was employed by St. Raphael Parish. Shortly thereafter, St. Raphael Parish and/or Frost fired Mr. Lynch's mother without cause, as retribution and as a warning to Mr. Lynch that the Roman Catholic Church, the Diocese, and the Parish intended to protect his abusers and were prepared to destroy his life, and the livelihoods of his loved ones, if he attempted to pursue justice for the crimes and torts committed against him.

Frost Compl. ¶ 88; Cunningham Compl. ¶ 85.  The entire course of conduct that Lynch alleges the Diocese and the Parish Defendants engaged in — including deliberate intimidation of Lynch and the retaliatory firing of his mother — for the purpose of discouraging a sexual assault survivor from pursuing his allegations

against two priests any further, is extreme and outrageous enough to sustain a claim for intentional infliction of emotional distress.[11]

The Court further finds that the complaints sufficiently allege the other elements of a claim for intentional infliction of emotional distress. Accordingly, the Diocese's and the Parish Defendants' motions to dismiss these claims in both the Frost and the Cunningham cases are denied.

## V.    Negligent Infliction of Emotional Distress Claims

Lynch advances claims for negligent infliction of emotional distress in both the Frost and Cunningham cases. "[U]nder New York law, a plaintiff may establish a claim for negligent infliction of emotional distress in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'" *Doe ex rel. Doe v. E. Irondequoit Cent. Sch. Dist.*, No. 16-CV-6594 (CJS), 2018 WL 2100605, at *26 (W.D.N.Y. May 7, 2018) (quoting *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000)).

> Under the 'bystander' theory, a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of shock or fright resulting from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant's conduct on a member of the plaintiff's immediate family in his or her presence.

---

[11] The Court notes that the Parish Defendants contend that Lynch, "who reported the abuse to bring it out into the open, cannot now complain that Diocesan officials[] investigated the claims[ and] requested that he 'recount in detail the sexual abuse he had suffered[]' and confront his alleged abusers." St. Raphael Frost Mem. at 19; Parish Cunningham Mem. at 20. This contention smacks of tactless victim blaming. In any event, the characterization flies in the face of Lynch's well-pleaded facts, which the Court must accept as true, alleging that the Diocese and the Parish Defendants "did not properly investigate the allegations." Frost Compl. ¶ 97; Cunningham Compl. ¶ 96.

> Under the "direct duty" theory, a plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably endangered plaintiff's own physical safety.

*Id.* (citation modified).

On the one hand, to the extent these claims are based upon the same alleged conduct that underpins Lynch's negligence, negligent hiring, gross negligence, and breach of fiduciary duty claims, these negligent infliction of emotional distress claims are duplicative. *See Demosthene v. City of New York*, No. 14-CV-816 (SJ) (VMS), 2018 WL 10072931, at *13 (E.D.N.Y. July 20, 2018) ("[A] claim for negligent infliction of emotional distress can be asserted only as a last resort, and should be dismissed if plaintiff can assert liability based on the same facts and circumstances under another cause of action."), *report and recommendation adopted*, 2019 WL 3992868 (Aug. 16, 2019), *aff'd*, 831 F. App'x 530 (2d Cir. 2020); *D.J. by Comfort v. Corning-Painted Post Area Sch. Dist.*, 722 F. Supp. 3d 148, 168 (W.D.N.Y. 2024) ("In similar cases, courts have concluded that claims for negligent infliction of emotional distress are duplicative of other negligence-based claims and dismissed the negligent infliction of emotional distress claims."), *reconsideration denied*, No. 22-CV-06567 (EAW), 2024 WL 5244392 (Dec. 30, 2024).

On the other hand, to the extent these claims are predicated upon intentional acts relating to the meetings at the Diocese between Lynch and his alleged abusers, they must also be dismissed, because intentional acts cannot form the basis of negligent infliction of emotional distress claims. *Semencic v. County of Nassau*, No. 18-CV-5244 (SJF) (AKT), 2020 WL 435294, at *10 (E.D.N.Y. Jan. 28, 2020)

("[D]eliberate or intentional actions do not create a claim for negligent infliction of emotional distress.").

Accordingly, the Diocese's and the Parish Defendants' motions to dismiss these claims in both the Frost and the Cunningham cases are granted.

## VI.  Breach of Fiduciary Duty Claims

Finally, Lynch advances breach of fiduciary duty claims in both the Frost and Cunningham cases.  "To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (citation omitted).  Such claims are contingent upon the existence of a special relationship, "one founded upon trust or confidence reposed by one person in the integrity and fidelity of another.  It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *LaFrantz*, 2024 WL 216718, at *6 (quoting *Penato v. George*, 383 N.Y.S.2d 900, 904 (N.Y. App. Div., 2d Dep't 1976)).  The "[t]wo essential elements of a fiduciary relationship are de facto control and dominance." *G.T. v. Roman Cath. Diocese of Brooklyn*, 180 N.Y.S.3d 75, 76 (N.Y. App. Div., 2d Dep't 2022) (quoting *Marmelstein v. Kehillat New Hempstead: The Rav Aron Jofen Comm. Synagogue*, 892 N.E.2d 375, 378 (N.Y. 2008)).

With respect to religious institutions specifically, New York courts have held that, when "a parishioner plaintiff seeks to establish the existence of a fiduciary relationship with an institutional church defendant, the plaintiff may not merely rely

on the church's status in general, but must come forward with facts demonstrating that his or her relationship with the institution was somehow unique or distinct from the institution's relationship with other parishioners generally." *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (N.Y. App. Div., 3d Dep't 2005). However, religious institutions have been found liable for breach of fiduciary duty when plaintiffs can articulate specific facts that placed them in a position of heightened reliance on or control by the religious institution. *See, e.g.*, *Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F. 3d 409, 429–30 (2d Cir. 1999) (affirming a jury verdict of breach of fiduciary duty where the diocese (1) ran the school the plaintiff attended; (2) knew that the plaintiff participated in group sessions with a mentor priest who abused the plaintiff; and (3) had received reports that the priest had earlier abused other victims).

The Parish Defendants argue that these claims fail because Lynch has not pleaded particularized facts establishing a unique relationship between him and these institutional Defendants and because of Lynch's membership in the Parish Defendants' congregations. St. Raphael Frost Mem. at 20–22; Parish Cunningham Mem. at 21–23. The Parish Defendants also argue that the fiduciary duty claims are duplicative of Lynch's negligence claims. St. Raphael Frost Mem. at 22; Parish Cunningham Mem. at 23. The Diocese similarly contends that Lynch has not pled the existence of a unique relationship that could establish the existence of a fiduciary duty. Diocese Frost Mem. at 26–28; Diocese Cunningham Mem. at 24–26.

Lynch responds that he did have a unique relationship with the Diocese and the Parish Defendants because (1) a Diocese Bishop permitted him to continue attending Cathedral Prep without paying tuition after the death of his father, and (2) both Lynch and his mother were employed by the Diocese and/or St. Raphael during the time of the alleged abuse. Pl. Frost Mem. at 22–23; Pl. Cunningham Mem. at 19–20. Lynch also asserts that his breach of fiduciary duty claims are not duplicative of his negligence claims because the federal rules permit pleading in the alternative. Pl. Frost Mem. at 26; Pl. Cunningham Mem. at 23; *see also* Fed. R. Civ. P. 8(d).

It is well settled that "[b]ecause the existence of a fiduciary relationship is generally a 'fact-specific inquiry reserved for a jury[,] claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion." *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, No. 11-CV-4416 (LAK), 2013 WL 628533, at *9 (S.D.N.Y. Feb. 15, 2013) (citation modified) (quoting *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, No. 01-CV-2669 (WHP), 2002 WL 31164482, at *16 (S.D.N.Y. Sep. 30, 2002)); *see also Marmelstein*, 892 N.E.2d at 378 ("Whether a fiduciary relationship has been established is an inquiry that is 'necessarily fact-specific.'" (citation omitted)). If Lynch's complaints allege facts that would, if credited by a jury, permit the conclusion that he was treated differently and held in a position of greater trust and dependency than the average parishioner, then resolving whether these unique aspects of his relationship to Defendants amounted to a fiduciary relationship is a question reserved for the jury.

Here, Lynch argues that his relationship with the Diocese and the Parish Defendants was different from the average parishioner in at least two ways. First, he alleges that both he and his mother were employed by the Diocese and/or St. Raphael. Frost Compl. ¶¶ 46, 88; Cunningham Compl. ¶¶ 53, 85. Lynch also alleges the unexpected death of his father had left his family in "a dire financial condition," Frost Compl. ¶ 3; Cunningham Compl. ¶ 3, permitting the inference that Lynch's and his mother's continued employment with the Diocese and St. Raphael was especially important to family. Important as this employment may have been, however, it is well established that an employment relationship alone does not establish a fiduciary relationship. *See Rather v. CBS Corp.*, 886 N.Y.S. 121, 125 (N.Y. App. Div, 1st Dep't 2009); *Daniels v. Am. Airlines*, No. 19-CV-03110 (MKB), 2020 WL 9816000, at *25 (E.D.N.Y. Sep. 4, 2020).

Second, Lynch alleges that Auxiliary Bishop Catanello permitted him to attend the Diocese's Cathedral Prep school tuition free following the death of Lynch's father. Frost Compl. ¶ 3; Cunningham Compl. ¶ 3. This tuition waiver, if proven, would suggest precisely the kind of unique or distinct relationship required to establish a fiduciary relationship. In effect, Lynch has alleged the Diocese and the Parish Defendants exerted unusual control over him because these Defendants could directly influence both his family's financial wellbeing and his own access to education.

The Court further notes that Auxiliary Bishop Catanello, who allegedly approved Lynch's tuition waiver, is the same official to whom Lynch allegedly reported Frost's and Cunningham's abuse, and who may have arranged for the

55

February 1997 meetings that were allegedly intended to intimidate and silence Lynch.  Frost Compl. ¶¶ 81, 83; Cunningham Compl. ¶¶ 78, 80.  Lynch further alleges that Catanello — a Diocesan official who allegedly personally extended an earlier special dispensation to Lynch in the form of a tuition waiver — was personally involved in attempts to cover up reported abuse by priests assigned to both St. Raphael and Good Shepherd.  At this stage in the litigation, these allegations preclude the Court from finding, as a matter of law, that no fiduciary relationship existed between Lynch on one side and either the Diocese, St. Raphael, and/or Good Shepherd on the other.

Accordingly, the Diocese's and the Parish Defendants' motions to dismiss the breach of fiduciary duty claims in both the Frost and Cunningham cases are denied.

## CONCLUSION

The Court has considered the parties' other arguments and finds them unavailing.  For the foregoing reasons, the various motions to dismiss before the Court are GRANTED IN PART and DENIED IN PART.

For the claims in the Cunningham case, the Court has resolved the Diocese's and St. Raphael's motions to dismiss as follows:

| Ordinary Negligence | GRANTED |
|---|---|
| Negligent Hiring, Retention, and Supervision | GRANTED |
| Gross Negligence | GRANTED |
| Intentional Infliction of Emotional Distress | DENIED |
| Negligent Infliction of Emotional Distress | GRANTED |
| Breach of Fiduciary Duty | DENIED |

For the claims in the Frost case, the Court has resolved the Diocese's and the Parish Defendants' motions to dismiss as follows:

| Ordinary Negligence | DENIED |
|---|---|
| Negligent Hiring, Retention, and Supervision | DENIED |
| Gross Negligence | DENIED |
| Intentional Infliction of Emotional Distress | DENIED |
| Negligent Infliction of Emotional Distress | GRANTED |
| Breach of Fiduciary Duty | DENIED |

SO ORDERED.

    */s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated: March 5, 2026
      Brooklyn, New York