MOSKOWITZ COLSON
GINSBERG SCHULMAN

Moskowitz Colson
Ginsberg Schulman LLP
One Battery Park Place
31st Floor
New York, NY 10004

(212) 257-6455
www.mcgsllp.com

November 20, 2026

Honorable Lara K. Eshkenazi
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Lynch v. Roman Catholic Diocese of Brooklyn, et al.*
23-cv-8687, 23-cv-4800 (NRM)(LKE)

Dear Judge Eshkenazi:

We represent Plaintiff Robert P. Lynch. Pursuant to Fed. R. Civ. P. 16(b)(4), we write to request that limited discovery be permitted to address serious questions concerning the truthfulness of testimony offered by corporate witnesses who testified on behalf of defendant Roman Catholic Diocese of Brooklyn (the "Diocese") and to explore the existence of records that the Diocese has represented do not exist.

**I. The Diocese Failed to Produce the Policy, and Its Witnesses Denied the Existence of Earlier Policies.**

Plaintiff assiduously sought production during discovery of all policies and procedures relevant to accusations of sex abuse. On July 30, 2024, the Diocese committed to producing all documents responsive to Plaintiff's request for "documents in existence at the time of the alleged abuse setting forth any of the [Diocese's] policies, procedures, protocols, guidelines, rules and/or regulations concerning protection of individuals (minors and others) from sexual abuse, the reporting of sexual abuse, and the protocols for receiving allegations of sexual abuse and investigating such complaints." (Ex. A at 19; Ex. B at 19-20.) The Diocese also committed to producing all complaints about, and any confidential files concerning, the defendant priests. The Diocese asserted that all such complaints were included in the priests' clergy files, which the Diocese produced. (Ex. A at 4-5, 16-17; Ex. B at 4-5, 16-17.) On November 12, 2026, counsel for Plaintiff discovered that the Diocese had failed to produce a 1962 policy document concerning the handling of reports of priest abuse of minors. Although the Policy had previously been submitted in court on the Diocese's behalf, the Diocese failed to produce it in this litigation, and witnesses testifying on its behalf denied the existence of such policies.

At their depositions, the Diocese's witnesses affirmatively denied that any written policies concerning how to respond to reports of sexual abuse existed before approximately 1979, at the earliest. Monsignor Otto Garcia, a former Chancellor of the Diocese, testified that the first written policy outlining how to address sexual misconduct allegations against priests

was not issued until approximately 1987. (Ex. C at 113.) J. Michael Ritty, who testified as a corporate representative of the Diocese in both the state litigation and in the federal cases before Your Honor, testified that the Diocese was unaware of any written policies concerning the handling of sexual abuse accusations against priests before 1979 and did not know how such allegations were handled before that date. (Ex. D at 136-37.)

We conducted our own investigation to explore the veracity of that testimony. On November 12, 2026, our office discovered, buried in a Queens County court archive related to a complaint against Defendant Frost and not produced by the Diocese, a written policy issued by the Vatican in 1962 and designated as "strictly confidential," concerning the procedures to be followed in the event that any penitent—including a minor—accused a priest of "solicit[ing] or provok[ing] [him] toward impure and obscene matters" (hereinafter, the "Policy"). Indeed, attorneys representing the Diocese had submitted the Policy to the New York Supreme Court in 2004 as an exhibit in *Davis v. Collins*, Index No. 23050/2003. Although the Diocese now contends that the Policy applies only if the priest's sexual abuse was inflicted in connection with the sacrament of confession, that characterization is incomplete. Preliminary paragraph 1 extends beyond misconduct occurring during confession to conduct occurring before or after confession, under its pretext, or in circumstances involving the appearance of confession. Moreover, paragraphs 71–73 address other forms of sexual misconduct, including misconduct involving children. (Ex. E ¶¶ 1, 71–73.) Regardless of the precise circumstances in which the Policy applied, the Diocese was obligated to produce all policies concerning sexual abuse of children—even policies that apply only to abuse inflicted in specific contexts—in response to Plaintiff's document demands. Nor does the Policy's issuance by the Vatican, rather than the Diocese, render it nonresponsive. The Policy prescribed procedures for diocesan officials handling allegations of sexual misconduct, and its relevance to the Diocese's practices does not depend on which ecclesiastical authority promulgated it. The Diocese also has not established that Frost's misconduct fell outside the circumstances addressed by the Policy.

The existence and terms of the Policy call into serious question the integrity of the Diocese's witnesses, whether the Diocese was aware that the testimony given on its behalf was false and materially misleading, and whether the Diocese has conducted proper document searches.

## II. The Policy.

The recently-discovered Policy provides that an accuser shall be excommunicated if the accuser does not keep his accusation strictly secret. (Ex. E ¶¶ 23, 26.) If the victim will not swear an oath under penalty of excommunication, no investigation can be conducted. (Ex. E ¶¶ 19-21.) The accused, unlike the victim, may under no circumstances be bound by an oath to tell the truth. (Ex. E ¶ 52.)

The Policy also imposes extraordinary secrecy over documents and proceedings concerning sexual abuse by priests and other religious personnel. Despite the usual Canon Law requirement that a Notary attend and keep a record of investigatory proceedings, the "special character of these procedures" requires that the Notary be excluded from investigations of sexual abuse. (Ex. E ¶ 9.) Matters governed by the Policy are to be "pursued in a most secretive way" and "restrained by a perpetual silence" on the part of everyone involved. (Ex. E ¶ 11.) Everyone involved "is to observe the strictest secret, which is commonly regarded as a secret of

the Holy Office, in all matters and with all persons, under the penalty of excommunication … [and] are bound to observe this secrecy inviolably." (*Id.*) Even the victim is required to swear an oath to keep secret what he knows about his abuse and the Diocese's response. (Ex. E ¶ 12.)

The Policy addresses the transfer of accused priests before and after the Ordinary (i.e., the Bishop) and the promoter of justice the Ordinary has appointed commence an inquisition in response to the reported abuse. (Ex. E ¶ 4.) Once an inquisition is opened, the Ordinary has discretion to prevent such a transfer. (Ex. E ¶ 29.)

The Policy also requires that all documents concerning an accusation and investigation either be destroyed or be kept in a secret archive. Once a denunciation is accepted, the Ordinary must communicate it to the promoter of justice, who is directed to assess whether the alleged offense has been sufficiently established and submit the matter to the Holy Office within ten days. (Ex. E ¶ 27.) If the Ordinary and the promoter of justice agree that the alleged offense has not been established, then the Ordinary must direct that all records be put into "the secret archives" or, in the alternative, "should use his right and duty according to the nature and gravity of the things that have been denounced." (Ex. E ¶ 28.) An inquisition can be commenced only if the Ordinary believes the denunciation is truthful. (*Id.*) When an inquisition is concluded, all documents are to be destroyed if the Ordinary concludes that the denunciation lacked foundation. (Ex. E ¶ 42.) If he is uncertain whether a crime has been committed, documents are to be kept in the secret archives, "to be taken up again if something else happens in the future." (*Id.*) If "there are indications of a crime serious enough … to institute an accusatorial process" but "only one or two denunciations are had," or if the denunciations were, in the Ordinary's opinion, not corroborated by sufficient proofs, then the documents are to be kept in the secret archives and "in meanwhile a check should be kept on the morals of the accused." (*Id.*)

When a priest who has been condemned or admonished for soliciting or provoking a penitent to "obscene or impure" matters is transferred to another territory, the Ordinary should immediately warn the Ordinary of the new location, in a communication under the secret of the Holy Office. (Ex. E ¶¶ 67-70.) Failure to warn the Ordinary of the new location, or failure to keep the warning secret, is a "serious sin" "concern[ing] the common good of the church to the greatest degree." (Ex. E ¶ 70.)

**III. Good Cause Exists to Reopen Discovery.**

Plaintiff was not aware of the Policy's existence or the apparent contradictions between its terms and the Diocese's witnesses' testimony before the close of discovery or at any time before counsel discovered the Policy on November 12, 2026. Nor could Plaintiff reasonably have foreseen the need for additional discovery concerning these matters. See *Moroughan v. County of Suffolk*, 320 F. Supp. 3d 511, 514–15 (E.D.N.Y. 2018).

The Diocese's corporate witnesses, and the Diocesan representatives who testified in their individual capacities, uniformly testified that the Diocese's practices and procedures were very different from, and often diametrically opposite to, the practices and procedures set forth in the Policy promulgated by the Holy See, raising questions about whether the Policy was implemented within the Diocese and whether the witnesses' testimony was accurate and complete.

Garcia testified that there was no document destruction policy at the Diocese (Ex. C at 79), but the Policy required that documents concerning allegations deemed not founded be destroyed and, further, permitted, at the Ordinary's discretion, the destruction of documents related to allegations found credible but unproven (Ex. E ¶ 42). Testifying pursuant to Rule 30(b)(6) on July 31, 2026, Ritty testified that he was unaware of any policies dictating what allegations of abuse would be brought to the Bishop in the 1970s (Ex. F at 30-31), but the Policy establishes procedures for receiving and investigating allegations, including requirements for sworn denunciations and secrecy (Ex. E ¶¶ 19-22, 52). Because Ritty testified as the Diocese's designated corporate representative, his testimony was required to reflect information known or reasonably available to the Diocese, not merely his personal recollection.

The witnesses uniformly testified that the Diocese keeps a personal file, a personnel file, and in the case of priests who have faced accusations, a confidential file for each priest in the Diocese, and that all documents related to a given priest would be found in one or more of those files. The Diocese produced in discovery a single "clergy" file for each defendant priest, which counsel represented to contain all records from all of the files maintained by the Diocese for each priest. But the Policy dictates that records of proceedings governed by the Policy that are not destroyed must be kept in the "secret archive" maintained by the Curia. (Ex. E ¶¶ 28, 42; *see* Ex. E at 1 (requiring that the Policy itself be "diligently stored in the secret archives of the Curia as strictly confidential").)

Records and testimony produced during discovery revealed the existence of approximately fourteen victims prior to Plaintiff who claim that Frost abused them. No records related to any complaints by any of those victims are included in the Frost clergy file that the Diocese produced. One of those victims later claimed to have informed a senior Diocesan official about the abuse at the time it occurred—but again, no documentation of such a report appears in Frost's file.

The newly discovered Policy raises serious questions about why those fourteen victims are not mentioned in Frost's clergy file. Under the Policy issued by the Vatican in 1962, reports of misconduct falling within its scope were required to be kept secret under pain of excommunication, and any documents related to those reports or any subsequent investigation were required to either be destroyed or kept in a secret archive at the Curia. Accordingly, there is substantial reason to believe that documents establishing that the Diocese received reports about Frost may have been destroyed or may remain in secret archives or other repositories that the Diocese has not adequately searched or disclosed.

In light of the above, Plaintiff respectfully requests the following relief:

1. An order directing the Diocese to conduct renewed searches of all document repositories and all custodians within its control for documents responsive to Plaintiff's demands, including documents stored in clergy files, confidential files and secret archives (whether maintained by the Diocese or by the Curia) related to the defendant priests, and to submit an affidavit detailing the searches originally conducted, the supplemental searches undertaken and their results, whether responsive records have been destroyed or transferred, and why the Policy and records concerning prior complaints against Frost were not previously produced.

2. Leave to recall Garcia and Ritty, together with any necessary supplemental Rule 30(b)(6) testimony, concerning the Policy, the Diocese's historical practices, the existence and maintenance of secret archives, the retention or destruction of responsive records, and the basis for their prior sworn testimony.
3. Such other remedial relief as the Court deems appropriate in light of the Diocese's failure to produce the Policy and any other responsive documents.

Plaintiff will be prepared to discuss this request at the forthcoming hearing scheduled for November 24, 2026.

Very Truly Yours,
Moskowitz Colson Ginsberg & Schulman

/s/ Peter R. Ginsberg
Peter R. Ginsberg
Eylan Schulman
Christopher Neff